UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X

DAHKEEM MILLER; JOSE GUITY; and         Case No. 21-cv-2616
TRAVIS BUTLER, on their own behalf and
on behalf of others similarly situated,

               Plaintiffs,         **COMPLAINT**
                              **JURY TRIAL DEMANDED**

      -v-

CITY OF NEW YORK; CYNTHIA BRANN;
TIMOTHY FARRELL; HAZEL JENNINGS;
and BRENDA COOKE,

               Defendants.
-------------------------------------------------------X

       Plaintiffs Dahkeem Miller, Jose Guity, and Travis Butler, by and through their attorneys,

Cuti Hecker Wang LLP, for their class action Complaint allege as follows:

       1.     This action arises from the unconstitutional policy and practice of the City of New

York (the "City") of placing substantial numbers of pretrial detainees in stealth isolation

confinement facilities indefinitely without due process and for illegitimate purposes.

       2.     For years, the New York City Department of Correction ("DOC") designated

three facilities – a portion of the West Facility and of the North Infirmary Command ("NIC") at

Rikers Island and the 9 South facility at the Manhattan Detention Complex ("9 South") – to

house supposedly high-security-risk detainees. Such detainees were confined under extremely

restrictive conditions, largely deprived of human contact. At West Facility, they were housed in

solitary confinement at least 23 hours per day. At NIC and 9 South, they were allowed contact

with at most one or two other inmates for a few hours a day. And they were placed in these

isolation facilities indefinitely, never knowing when if ever they would be released to a less

restrictive setting.

3.      Upon information and belief, pretrial detainees placed in indefinite isolation confinement at West Facility, NIC, or 9 South were not given a hearing or other meaningful opportunity to challenge the nature, conditions, or continuation of their isolation confinement. Indeed, it appears that Defendants deprived these pretrial detainees of that opportunity, and placed them in these stealth facilities, precisely because it was understood that placing them in indefinite isolation confinement violated DOC's own rules.

4.      Defendants' policy and practice of placing pretrial detainees in indefinite solitary confinement at West Facility and in indefinite isolation confinement at NIC and 9 South without pre- or post-placement hearings violated both the procedural and substantive components of the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

5.      Plaintiff Dahkeem Miller was placed in indefinite solitary confinement at West Facility that ultimately lasted approximately 11 months between the middle of 2017 and the middle of 2018.  He was approximately 19 years old at the time.  Under DOC's own rules, it is unlawful to place a detainee who is less than 22 years old in punitive segregation for any amount of time for any reason.  In a clear effort to end-run around DOC's own rules, Defendants placed Plaintiff Miller in indefinite solitary confinement at West Facility under the guise that the placement was something other than punitive segregation.  Plaintiff Miller was not given a hearing or afforded other due process at any point during his placement in solitary confinement at West Facility.

6.      Plaintiff Jose Guity was placed in indefinite isolation confinement for several months at NIC in 2019 and for several more months at 9 South in or about 2019 to 2020.  He was approximately 20 years old at the time.

7.      Plaintiff Travis Butler likewise was placed in indefinite isolation confinement for several months at NIC and 9 South in or about 2019 to 2020.  He was approximately 20 years old at the time.

8.      Defendants placed Plaintiffs Guity and Butler in indefinite isolation confinement at these facilities under the guise that the placement was something other than punitive segregation.  Neither Plaintiff Guity nor Plaintiff Butler was given a hearing at any point during their placement in isolation confinement at NIC or 9 South.

9.      The tragedy of this case is that the due process protections that Defendants purposefully evaded were designed and enacted precisely because it is well established that young adults like Plaintiffs Miller, Guity, and Butler are particularly susceptible to serious and lasting harm when subjected to prolonged periods of isolation.  Defendants knew that the reason why it is unlawful to subject young pretrial detainees to prolonged periods of isolation is that doing so is irresponsibly dangerous.  Defendants knew that the reason why it is unlawful to subject anyone to prolonged periods of isolation without affording them daily medical and mental health services and frequent periodic placement reviews is that doing so is irresponsibly dangerous.  But Defendants nonetheless punished Plaintiffs and deprived them of their liberty, consciously ignoring their own rules and the serious risks the rules are intended to mitigate.

10.      Plaintiffs now seek justice for themselves and for a putative class of similarly situated pretrial detainees.

## JURISDICTION AND VENUE

11.      This action arises under 42 U.S.C. §§ 1983 and 1988 and the Fourteenth Amendment to the United States Constitution.

12.     The jurisdiction of this Court is predicated on 28 U.S.C. §§ 1331, 1343, 2201, and 2202.

13.     Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391(b) because a substantial portion of the acts complained of occurred in the Southern District of New York.

**JURY DEMAND**

14.     Plaintiffs demand a trial by jury in this action.

**PARTIES**

15.     Plaintiff Dahkeem Miller is a natural person who currently resides in Kings County, New York.  During his incarceration at Rikers Island, he was placed in indefinite solitary confinement at West Facility.

16.     Plaintiff Jose Guity is a natural person who currently resides in Queens County, New York.  During his incarceration at Rikers Island, he was placed in indefinite isolation confinement at both NIC and 9 South.

17.     Plaintiff Travis Butler is a natural person who currently resides in Bronx County, New York.  During his incarceration at Rikers Island, he was placed in indefinite isolation confinement at both NIC and 9 South.

18.     Defendant the City of New York is a municipal corporation which, through DOC, operates several detention facilities for pretrial detainees.

19.     The City is responsible for promulgating and implementing policies with respect to the use of actual and de facto punitive isolation confinement by DOC, and also is responsible for the appointment, training, supervision, and conduct of all DOC personnel.

20.     The City promulgated the policy and practice that is being challenged in this action: placing supposedly high-security-risk detainees in solitary confinement at West Facility

and in isolation confinement at NIC and 9 South without affording due process and for illegitimate purposes.

21.    Defendant Cynthia Brann, who is sued in her personal capacity, is, and at all relevant times was, the Commissioner of DOC.  As such, she was and remains the chief executive of DOC.  Upon information and belief, Defendant Brann was personally involved in the decision to place allegedly high-security-risk inmates in indefinite isolation confinement at West Facility, NIC, and 9 South without affording them a hearing or opportunity to challenge the nature, conditions, or continuation of their isolation confinement.

22.    Defendant Timothy Farrell, who is sued in his personal capacity, is, and at all relevant times was, the Senior Deputy Commissioner of DOC.  As such, he was and remains responsible for major classification and custody policies and practices.  Upon information and belief, Defendant Farrell was personally involved in the decision to place allegedly high-security-risk inmates in indefinite isolation confinement at West Facility, NIC, and 9 South without affording them a hearing or opportunity to challenge the nature, conditions, or continuation of their isolation confinement.

23.    Defendant Hazel Jennings, who is sued in her personal capacity, is, and at all relevant times was, the Chief of Department of DOC.  As such, she was and remains responsible for major classification and custody policies and practices.  Upon information and belief, Defendant Hazel was personally involved in the decision to place allegedly high-security-risk inmates in indefinite isolation confinement at West Facility, NIC, and 9 South without affording them a hearing or opportunity to challenge the nature, conditions, or continuation of their isolation confinement.

24.     Defendant Brenda Cooke, who is sued in her personal capacity, is the Chief of Staff of DOC, and prior to that, she was the Deputy Chief of Staff.  As such, she was and remains responsible for supporting and advising the Commissioner on operational and policy initiatives.  Upon information and belief, Defendant Cooke was personally involved in the decision to place allegedly high-security-risk inmates in indefinite isolation confinement at West Facility, NIC, and 9 South without affording them a hearing or opportunity to challenge the nature, conditions, or continuation of their isolation confinement.

### STATEMENT OF FACTS

25.     The City operates various jails, houses of detention, and court pens in each of the five Boroughs.

26.     During the relevant period, the vast majority of detainees in DOC facilities were pretrial detainees, awaiting trial because they could not pay bail.

27.     Solitary confinement, and other forms of highly restrictive isolation confinement, are among the most severe forms of punishment that can be inflicted on human beings.

28.     Section 626(e) of the New York City Charter provides that the New York City Board of Correction ("BOC"), a nine-person oversight board that regulates, monitors, and inspects New York City jails to facilitate and support safer, fairer, and more humane conditions of confinement, "shall establish minimum standards for the care, custody, correction, treatment, supervision, and discipline" of all inmates confined by DOC (the "Minimum Standards").

29.     The BOC's Minimum Standards are mandatory and binding on DOC.

30.     Section 1.02(f)(2)(v) of the Minimum Standards requires that inmates "placed in the most restrictive security status shall only be denied those rights, privileges and opportunities

that are directly related to their status and which cannot be provided to them at a different time or place than provided to other prisoners."

31.     Section 1.05(b) of the Minimum Standards provides that unless an inmate is confined in punitive segregation or Enhanced Supervision Housing (discussed below), an inmate shall not be locked in his or her cell except for a period at night not to exceed eight hours and a period during the day not to exceed two hours.  Section 1.05(a) of the Minimum Standards provides that "time spent by prisoners confined to their cells should be kept to a minimum and required only when necessary for the safety and security of the facility."

32.     Section 1-17 of the Minimum Standards governs the use of punitive segregation. Punitive segregation is "a severe penalty" that "represents a serious threat to the physical and psychological health of adolescents." 40 R.C.N.Y. 1-17(a).  DOC is forbidden from imposing punitive segregation on inmates under 22 years old or on inmates with serious mental or physical disabilities or conditions.  *Id*. § 1-17(b).

33.     Section 1-17 of the Minimum Standards further requires that inmates be afforded specific "due process" protections before punitive segregation may be imposed, including prior written notice of the nature of the disciplinary charge and the behavior allegedly supporting it, and the ability to appear in person and present evidence and call witnesses.  *Id*. § 1-17(c).

34.     Section 1-17 of the Minimum Standards further prohibits an inmate from being sentenced to indeterminate punitive segregation sentences or sentences of longer than 30 days (except for serious assaults on staff, for which the maximum sentence is 60 days).  *Id*. §§ 1-17(d)(1)-(d)(2).  An inmate may not be confined in punitive segregation for more than 60 days during any six-month period.  *Id*. § 1-17(d)(3).

35.     At no point were any of the named Plaintiffs eligible for punitive segregation because each of them was less than 22 years old, nor were they afforded the due process protections that the rules expressly require before punitive segregation may be imposed.

36.     Section 1-16 of the Minimum Standards addresses so-called Enhanced Supervision Housing ("ESH").  ESH "is designed to separate from the general population those inmates who pose the greatest threats to the safety and security of staff and other inmates" and "additionally seeks to promote the rehabilitation of ESH inmates by incentivizing good behavior and by providing necessary programs and therapeutic resources."  *Id*. § 1-16(a).

37.     An inmate may be confined in ESH only "if the inmate presents a significant threat to the safety and security of the facility if housed elsewhere."  *Id*. § 1-16(b).  Such a determination shall only be supported by a finding that the inmate is an active gang leader, has seriously injured someone during his or her incarceration, possessed a scalpel or other serious weapon, or engaged in persistent violence.  *Id*.

38.     An inmate may not be placed in ESH without being afforded written notice, within 24 hours of placement, stating the grounds that justify the placement and the specific restrictions that DOC intends to impose on the inmate.  *Id*. § 1-16(f).  Within three days of such notice, DOC must conduct a formal hearing to adjudicate the propriety of both the inmate's placement in ESH and also the specific restrictions that are being imposed.  *Id*. § 1-16(g).  DOC is required to engage in a detailed review of the facts, the individual restrictions, and any evidence presented by the inmate or his or her witnesses.  *Id*.  The inmate must be provided with a written decision explaining the specific bases for the determination that each specific restriction is necessary.  *Id*.

39.     Because ESH may be imposed for an indefinite period of time, the Minimum Standards expressly require DOC to conduct periodic reviews at least every 45 days to "determine whether the inmate continues to present a significant threat to the safety and security of the facility if housed outside ESH such that continued ESH placement is appropriate." *Id*. § 1-16(h)(1). Inmates are entitled to advanced written notice of such periodic reviews and the opportunity to present evidence, and DOC must provide the inmate with a written determination detailing the reasons why the specific restrictions being imposed remain necessary. *Id*. §§ 1-16(h)(2), (h)(3).

40.     The restrictions imposed in ESH may not "deviate from those imposed on inmates in the general population" unless such restrictions are "required to address the specific safety and security threat posed by that individual inmate." *Id*. § 1-16(d)(1).

41.     DOC "shall provide ESH inmates with both voluntary and involuntary, as well as both in- and out-of-cell, programming aimed at facilitating rehabilitation, addressing root causes of violence, and minimizing idleness." *Id*. § 1-16(d)(3).

42.     "All inmates in ESH shall be seen at least once each day by medical staff who shall make referrals to medical and mental health services where appropriate." *Id*. § 1-16(d)(4).

43.     Every 60 days, DOC must provide BOC with a detailed and accurate accounting regarding its use of ESH. *Id*. § 1-16(i).

44.     At no point were any of the named Plaintiffs eligible to be placed in ESH because none of them was afforded the due process protections that the rules expressly require before ESH may be imposed, nor was there ever any meaningful periodic review of their placement, nor did the conditions of their confinement in West Facility, NIC, or 9 South comport with the Minimum Requirements regarding ESH.

45.     DOC also engages in the placement of inmates in so-called "close custody," which is not expressly defined in the Minimum Standards but which is governed by DOC Directive No. 6006R-D.  Close custody is, together with punitive segregation, "considered the most restrictive status assigned to an inmate."  *Id*. § 2(A).  Close custody may be used either for an inmate's own protection or to ensure the safety of other inmates or staff.  *Id*.

46.     Directive No. 6006R-D requires that certain "due process" protections be afforded before an inmate may be placed in close custody, including written notice of the reason for the assignment and a formal hearing at which the inmate may contest the assignment.  *Id*. § 2(B).  A facility captain must explain to the inmate the conditions of confinement in close custody and inform him or her that a determination will be made within two days whether to continue the placement and that he or she will have the right to a "due process hearing."  *Id*. §§ (C)(1)(c), (D)(1), (D)(5), (E).

47.     DOC shall not impose close custody where "less restrictive methods" are available.  *Id*. § 3(A)(2).

48.     DOC shall not impose close custody without first performing a mental health review of the inmate.  *Id*. § 3(B).

49.     DOC must review all close custody placements at least every 28 days, including by providing the inmate with advance written notice of such periodic review, the opportunity for the inmate to present evidence, and a written determination explaining the reasons why continuation of the close custody placement remains necessary.  *Id*. § 3(F).

50.     DOC must ensure that inmates placed in close custody receive all programs and services that are afforded to those housed in the general population.  *Id*. § 4(D)(3)

51.    At no point were any of the named Plaintiffs eligible for close custody because none of them was afforded the due process protections that the rules expressly require before close custody may be imposed, nor was there ever any meaningful periodic review of their placement, nor did the conditions of their confinement in West Facility, NIC, or 9 South comport with Directive No. 6006R-D.

52.    The placement of Plaintiffs in West Facility, NIC, and 9 South also violated Plaintiffs' rights to dayroom access as set forth in DOC Directive No. 3248.

53.    Upon information and belief, Defendants placed Plaintiffs in solitary confinement in West Facility or in isolation confinement in NIC or 9 South precisely because they knew that Plaintiffs were not eligible for placement in punitive segregation, ESH, or close custody and/or because Defendants wished to ignore the due process and other protections DOC's own rules expressly impose to protect Plaintiffs from arbitrary, punitive, and/or unnecessarily restrictive conditions of confinement.

54.    On or about September 29, 2016, BOC served DOC with written notice of its formal findings that DOC was operating West Facility as an unlawful restrictive segregation unit (the "BOC Letter").  The BOC Letter expressly found that inmates were placed in isolation housing at West Facility "without *any* due process such as written notice of the placement including the reasons therefor or an opportunity to challenge the placement" (emphasis in original).  The BOC Letter expressly found that inmates "are denied access to a full-serviced law library, may be denied the right to practice their religion in a congregate setting, receive their meals through food slots on their inner cell door, and are confined to individual cages for recreation."

55.     The BOC Letter demanded that DOC immediately afford West Facility inmates certain "due process protections," including "(i) written notification specifying reasons for the placement in this unit; (ii) an opportunity to challenge the placement at a hearing at which the inmate may call witnesses and present documents; (iii) the assignment of a hearing facilitator if necessary; (iv) a written decision; and (v) periodic placement reviews."  The BOC Letter demanded that DOC engage in a prompt review of each person detained at West Facility, including "(i) a review of the security risks posed by providing these individuals with full and equal access to programs and services as required by the Minimum Standards; (ii) a review of each inmate's housing history; (iii) a review of each inmate's mental health care and health care history; and (iv) a comparative review of the security risks posed by incarcerated individuals at the West Facility versus those individuals who are also in protective custody and enhanced restraint status but who are housed in less restrictive settings."

56.     Upon information and belief, Defendants failed to comply with the demands in the BOC Letter and chose knowingly and purposefully to continue their unlawful policy and practice of placing pretrial detainees in stealth solitary confinement or other isolation facilities indefinitely without due process and for illegitimate purposes.

57.     In West Facility, such detainees were confined to single-occupancy cells for at least 23 hours per day, seven days per week, socially isolating them from others.

58.     Such detainees were fed all of their meals in their cells.

59.     Because West Facility was intended to serve primarily as an infectious disease facility, its cells contain individual showers.  Defendants required such detainees to shower in their cells.

60.     Such detainees were permitted, at most, one hour per day of "recreation" time, weather permitting, in a small outdoor cage that was akin to a kennel with no exercise equipment.

61.     Normal human conversations were largely impossible for the pretrial detainees who were placed in solitary confinement in West Facility.

62.     Such detainees could not communicate with other inmates at least 23 hours per day.

63.      In NIC and 9 South, pretrial detainees were placed in small single occupancy cells that shared a small common indoor cage with either one or two other cells.  Such detainees were kept alone in their cells most of the day, except for designated times when they and their one or two cage-mates were allowed to congregate in the small indoor cage, where there was nothing to do.

64.     The pretrial detainees who were placed in solitary confinement at West Facility, and in isolation confinement at NIC and 9 South, were much more limited in their ability to interact with loved ones outside of Rikers Island compared with general population detainees.

65.     Such detainees were prohibited from work assignments and were afforded no or at most very limited access to programming or vocational activities.

66.     Such detainees were afforded only limited access to appropriate and timely health care, including especially mental health care.

67.     It is well known that even physically and mentally healthy persons will suffer harm when placed in isolation.

68.     It is well known that prolonged isolation such as that which the City imposed at West Facility, NIC, and 9 South tends to cause severe trauma, even after short periods of confinement.

69.     Harms caused by such isolation include headaches, dizziness, heart palpitations, increased pulse, loss of appetite, digestive failures, hypersensitivity to noise and light, an inability to maintain concentration, depression, anxiety, and suicidal ideation.

70.     Prolonged isolation continues to cause harms even after a person is released from detention, increasing the difficulty for individuals who have been detained in jail to function productively in their communities.

71.     Pretrial detainees may not constitutionally be subjected to conditions which are intended to serve or have the effect of punishment.

72.     Pretrial detainees may not constitutionally be subjected to conditions of confinement that have no reasonable connection to a legitimate non-punitive objective.

73.     Before placing Plaintiffs or the other putative class members in solitary confinement in West Facility, or in isolation confinement at NIC or 9 South, the City never considered whether such placement of such detainees was connected in any reasonable way to maintaining security and order at Rikers Island.

74.     Neither Plaintiffs nor any of the other putative class members who were placed by the City in solitary confinement in West Facility or in isolation confinement at NIC or 9 South were ever afforded a hearing at which it was determined that such confinement was necessary to maintaining security and order.

75.     Instead, the City placed pretrial detainees in solitary confinement in West Facility and in isolation confinement at NIC and 9 South in an arbitrary manner without affording such individuals due process.

76.     The City never evaluated on an individual basis the reasonableness or necessity of the extremely restrictive conditions imposed on individuals detained in solitary confinement in West Facility and in isolation confinement at NIC and 9 South.

77.     The City placed individuals in solitary confinement at West Facility and in isolation confinement at NIC and 9 South indefinitely, depriving them even of the opportunity to look forward to a date certain when they would be placed in less restrictive housing, or the incentive to behave in a manner that would allow them to transfer to less oppressive conditions, and with no periodic reviews of their placements in such highly restrictive settings.

78.     The City's policy and practice of placing pretrial detainees in indefinite solitary confinement in West Facility and in indefinite isolation confinement at NIC and 9 South was arbitrary, unrelated to the effective management of safety and security in the facility, and not reasonably related to any legitimate interest in maintaining order in DOC facilities.

79.     The City's policy and practice was to place pretrial detainees in indefinite solitary confinement in West Facility, and in indefinite isolation confinement at NIC and 9 South, for the purpose of punishment and in direct contravention of such detainees' right to be free from punishment before the government has secured a formal adjudication of guilt in accordance with due process of law.

80.     The City's policy and practice of placing pretrial detainees in indefinite solitary confinement in West Facility, and in indefinite isolation confinement at NIC and 9 South, lacked

any rational purpose other than punishment, and even if there were such a purpose, such confinement was excessive and not reasonably related to a legitimate governmental objective.

81.     Pursuant to the City's policy and practice, when such pretrial detainees were placed in indefinite solitary confinement at West Facility and in indefinite isolation confinement at NIC and 9 South, the City refused to provide the following:  the opportunity to appear at a hearing concerning the need for the restrictive conditions being imposed, either at the outset or after the conditions were imposed; the opportunity to call witnesses and present rebuttal evidence; and a written statement by the fact-finder as to the evidence relied on and the reason for the action in violation of the Fourteenth Amendment's procedural due process protections.

82.     Pretrial detainees have a liberty interest in not being placed in solitary confinement or isolation confinement arising both from the Fourteenth Amendment itself, by reason of guarantees implicit in the word "liberty," and from an expectation or interest created by state and city laws or policies, including without limitation each of the legal provisions discussed above.

83.     The City's policy and practice of placing pretrial detainees in indefinite solitary confinement in West Facility, and in indefinite isolation confinement at NIC and 9 South, without a pre- or post-placement hearing, deprived pretrial detainees of their liberty interest in not being subjected to highly restrictive conditions of confinement without adequate process.

84.     Plaintiff Dahkeem Miller was detained at Rikers Island as a pretrial detainee.

85.     Plaintiff Miller did not pose a disproportionate threat to the safety of staff or other inmates compared to other inmates in the Rikers Island general population.

86.     Plaintiff Miller was placed in indefinite solitary confinement at West Facility.

87.     Plaintiff Miller served approximately 11 months in solitary confinement at West Facility.

88.     Plaintiffs Jose Guity and Travis Butler were detained at Rikers Island as pretrial detainees.

89.     Plaintiffs Guity and Butler did not pose a disproportionate threat to the safety of staff or other inmates compared to other inmates in the Rikers Island general population.

90.     Plaintiffs Guity and Butler were placed indefinitely in isolation confinement at NIC and 9 South for several months each in or about 2019 and 2020.

91.     None of the named Plaintiffs received advance written notice, a hearing, the opportunity to defend themselves, the opportunity to establish facts concerning what an appropriate placement should be, or a written statement by a fact-finder before they were placed in these extremely restrictive confinements.

92.     None of the named Plaintiffs was ever afforded a hearing or other opportunity to challenge the lawfulness of their placement in these extremely restrictive confinements.

93.     None of the named Plaintiffs was ever afforded a hearing or other opportunity to challenge the ongoing continuation of their placement in these extremely restrictive confinements.

94.     Upon information and belief, the placement of Plaintiffs in indefinite isolation confinement without a pre- or post-placement hearing was expressly authorized by an official DOC policy.

95.     Upon information and belief, the placement of Plaintiffs in indefinite isolation confinement without a pre- or post-placement hearing was consistent with and part of a widespread official DOC custom and practice.

96.     Plaintiff Miller was generally confined to his cell twenty-four hours per day except for an occasional hour of "recreation."  He was isolated and deprived of almost all social interaction with others.

97.     Plaintiffs Guity and Butler were placed in an isolation cell and allowed to interact only with at most one or two other inmates, for limited periods each day, in a very small indoor cage attached to their cells.

98.     During their confinement at West Facility, NIC, and 9 South, Plaintiffs were subjected to onerous and punitive conditions of confinement that are not imposed upon detainees held in general population.

99.     The City did not evaluate the reasonableness of Plaintiffs' placements in these extremely restrictive settings or the availability of adequate alternatives in light of their circumstances and the circumstances of the facility.

100.    During their placement in these extremely restrictive settings, Plaintiffs repeatedly complained about and attempted to grieve the denial of their requests for a hearing.

101.    Because of their placement in these extremely restrictive settings at West Facility, NIC, and 9 South, Plaintiffs and the other putative class members suffered mental, emotional, and psychological harm, in addition to loss of liberty.

102.    Isolation confinement is one of the most severe forms of punishment that can be inflicted on human beings.

103.    For years, the City has known that isolation confinement causes serious and permanent harm to inmates and constitutes punishment.

104.    The use of isolation confinement in this arbitrary and capricious manner needlessly caused severe pain and suffering to Plaintiff and similarly situated detainees.

## CLASS ALLEGATIONS

105.    With respect to their claims for damages, Plaintiffs bring this action on their own

behalf and, pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(l), and 23(b)(3), on behalf

of:

> All pretrial detainees who were housed in indefinite isolation
> confinement in West Facility, North Infirmary Command, or Manhattan
> Detention Complex at any time on or after March 25, 2018.

106.    The class is so numerous that joinder of all members is impracticable.  Upon

information and belief, during the past three years, hundreds of detainees in DOC custody were

placed in indefinite solitary or isolation confinement in these facilities without due process.

107.    Pursuant to the City's policy and practice, none of these detainees received

adequate process before being subjected to such confinement.

108.    Most of the putative class members are economically disadvantaged, making

individual lawsuits impracticable.

109.    Judicial economy weighs in favor of avoiding multiple actions challenging the

same policy and practice, particularly where individual suits could lead to potentially

inconsistent results.

110.    The class members are identifiable using records maintained by the City in the

ordinary course of business.

111.    Common questions of law and fact exist for all class members herein and

predominate over any questions solely affecting individual members thereof.

112.    Among the questions of law and fact common to members of the class are:

    a.  whether the City's policy and practice of placing pretrial detainees in indefinite isolation confinement in West Facility, NIC and 9 South without adequate process violated the Fourteenth Amendment;

    b.  whether placing pretrial detainees in indefinite isolation confinement in West Facility, NIC and 9 South was for the purpose of punishment and/or had the effect of imposing punishment;

    c.  whether placing pretrial detainees in indefinite isolation confinement in West Facility, NIC and 9 South was reasonably related to a legitimate non-punitive objective;

    d.  whether pretrial detainees had a liberty interest in avoiding indefinite placement in isolation confinement; and

    e.  what process pretrial detainees were due before and during placement in indefinite isolation confinement in West Facility, NIC and 9 South.

113.    The City is expected to raise common defenses to the claims of all class members herein, including denying that its policy and practice violated the Constitution.

114.    Plaintiffs' claims are typical of those of all putative class members herein, as Plaintiffs' claims arise from the same municipal policy and practice, and Plaintiffs' claims are based on the same legal theories as those of all putative class members herein.

115.    The cause of Plaintiffs' injuries is the same as the cause of the injuries suffered by all putative class members herein, namely the City's policy and practice.

116.    Maintaining this action as a class action is superior to other available methods because individual damages claims are not likely to be feasible.

117.    Plaintiffs are capable of fairly and adequately protecting the interests of all putative class members herein because Plaintiffs do not have any antagonistic interests thereto.

118.    Counsel for Plaintiffs is experienced in civil rights litigation, prisoners' rights litigation, complex litigation, and class actions.

## FIRST CLAIM FOR RELIEF
42 U.S.C.§ 1983 - Fourteenth Amendment
(Substantive Due Process)

119.    Plaintiffs repeat and reallege the foregoing paragraphs as if the same were fully set forth at length herein.

120.    Under the Due Process Clause, a pretrial detainee may not be punished prior to an adjudication of guilt in accordance with due process of law.

121.    Isolation confinement may be imposed upon pretrial detainees only for a legitimate governmental purpose and not for the purpose of punishment.

122.    The City's policy and practice described herein was intended to punish and/or had the effect of punishing Plaintiffs and the putative class members in violation of their Fourteenth Amendment right to be free from punishment as pretrial detainees.

123.    The City's policy and practice of placing detainees in indefinite isolation confinement was particularly punitive because it deprived them of the opportunity to look forward to a date certain when they would be placed in a less restrictive setting.

124.    By placing Plaintiffs and the putative class members in indefinite isolation confinement under harsh conditions that were not reasonably related to any legitimate interest in maintaining order in the facility, the City punished Plaintiffs and the putative class members in violation of their Fourteenth Amendment right to be free from punishment as pretrial detainees.

125.    As a result of this unconstitutional policy and practice, Plaintiffs and the putative class members suffered and continue to suffer physical, psychological, mental, and/or emotional injuries, as well as loss of liberty.

126.    As a direct and proximate result of the City's policy and practice, Plaintiffs and the putative class members suffered damages in an amount to be proven at trial.

127.    Because Defendants' unlawful conduct was knowing, purposeful, malicious, and outrageous, Plaintiffs and the putative class members are entitled to an award of punitive damages.

**SECOND CLAIM FOR RELIEF**
42 U.S.C. § 1983 - Fourteenth Amendment
(Procedural Due Process)

128.    Plaintiffs repeat and reallege the foregoing paragraphs as if the same were fully set forth at length herein.

129.    By its policy and practice described herein, the City authorized the placement of Plaintiffs and the putative class members in indefinite isolation confinement without adequate process, violating the Due Process Clause of the Fourteenth Amendment.

130.    Plaintiffs and the putative class members have a liberty interest in avoiding overly and needlessly restrictive conditions confinement.  This liberty interest arises from both the Due Process Clause of the Fourteenth Amendment, by reason of guarantees implicit in the word "liberty," and from an expectation and interest created by state and city laws and regulations, including without limitation those discussed above.

131.    By placing Plaintiffs and the putative class members in indefinite isolation confinement without regard for the appropriateness of such confinement and without adequate process, the City violated the right of Plaintiffs and the putative class members to due process.

132.    Neither Plaintiffs nor the putative class members were afforded any pre- or post-placement hearing before or after being placed in isolation confinement during which it was determined that continued placement in such confinement was reasonably necessary for a legitimate purpose.

133.    As a result of this unconstitutional policy and practice, Plaintiffs and the putative class members have suffered and continue to suffer physical, psychological, mental, and/or emotional injuries, as well as loss of liberty.

134.    As a direct and proximate result of the City's policy and practice, Plaintiffs and the putative class members suffered damages in an amount to be proven at trial.

135.    Because Defendants' unlawful conduct was knowing, purposeful, malicious, and outrageous, Plaintiffs and the putative class members are entitled to an award of punitive damages.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs requests that the Court grant the following relief:

a.    Declare that the suit is maintainable as a class action pursuant to Federal Rules of Civil Procedure 23(a), (b)(1), and (b)(3);

b.    Award compensatory damages in an amount to be determined for all physical, psychological, mental, and emotional injuries, as well as loss of liberty, sustained by Plaintiffs and the class as a result of the policies and practices alleged herein;

c.    Award punitive damages;

d.    Award reasonable attorneys' fees, together with the costs of this action; and

e.    Grant such other further relief as the Court may deem appropriate.

Dated:  March 25, 2021
        New York, New York

                           Respectfully submitted,

                            /s/Eric Hecker
                           Eric Hecker (ehecker@chwllp.com)
                           John Cuti (jcuti@chwllp.com)
                           Alexander Goldenberg (agoldenberg@chwllp.com)
                           CUTI HECKER WANG LLP
                           305 Broadway, Sixth Floor
                           New York, NY 10007
                           (212) 620-2600

                           *Attorneys for Plaintiffs*