UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X

| | |
|---|---|
| DAHKEEM MILLER; JOSE GUITY; TRAVIS BUTLER; ARIAN PERALTA; GARY GARCIA, JR.; BOBBY DEE CRUZ, and ISAIAH MUHAMMAD, on their own behalf and on behalf of others similarly situated, | Case No. 21-cv-2616 (PKC) (KNF) **DECLARATION OF ALEXANDER A. REINERT** |
| Plaintiffs, | |
| -v- | |
| CITY OF NEW YORK; CYNTHIA BRANN; TIMOTHY FARRELL; HAZEL JENNINGS; and BRENDA COOKE, | |
| Defendants. | |

-------------------------------------------------------X

ALEXANDER A. REINERT, a member of the bars of New York and of this Court, pursuant to 28 U.S.C. § 1746, declares under penalty of perjury as follows:

1. I am an attorney at law and, along with Cuti Hecker Wang LLP, represent the Plaintiffs in this case. I submit this Declaration in support of Plaintiffs' unopposed motion seeking the Court's preliminary approval of the stipulation of settlement in this matter, attached as Exhibit 1 to this Declaration (the "Stipulation"), conditional certification of the settlement class, appointment of Plaintiffs' counsel as Class Counsel, and appointment of Rust Consulting, Inc. ("Rust") as Claims Administrator.

2. This case was initiated by Plaintiffs Dahkeem Miller, Travis Butler, and Jose Guity on March 25, 2021, against Defendants the City of New York, Cynthia Brann, Timothy Farrell, Hazel Jennings, and Brenda Cooke ("Defendants" or "the City"). On May 25, 2021, Plaintiffs filed a First Amended Complaint elaborating their claims and adding three new named Plaintiffs (Arian Peralta, Gary Garcia, Jr., and Bobby Dee Cruz). With Defendants' consent,

1

Plaintiffs filed a Second Amended Complaint on August 23, 2021, the operative complaint in this action.

3. Plaintiffs alleged that, for years and without providing any process whatsoever, Defendants placed Pretrial Detainees (defined as incarcerated people who were awaiting trial or a parole revocation hearing while in custody) in the custody of the New York City Department of Correction ("DOC") in restrictive and punitive conditions in three specific facilities: West Facility on Rikers Island ("West"); the second and third floors of North Infirmary Command on Rikers Island ("NIC"); and the "9 South" housing area of the now-shuttered Metropolitan Detention Center (collectively, the "Covered Facilities"). Plaintiffs alleged that the highly restrictive and punitive conditions in the Covered Facilities, and the fact that no process was afforded before Plaintiffs were placed in them, violated the Due Process Clause of the Fourteenth Amendment to the United States Constitution and numerous New York City Board of Correction ("BOC") Minimum Standards, most tellingly the requirement that Plaintiffs be permitted to congregate outside of their cells at least 14 hours per day. Sec. Am. Compl. ¶¶ 2-3, 37 (ECF 37). None of the putative Class Members received any due process regarding their placement in these restrictive housing conditions. Plaintiffs alleged that this practice violated their substantive and procedural due process rights.

4. Plaintiffs alleged that the unlawful nature of this confinement was brought to DOC's attention several years ago by the BOC, which oversees DOC. *Id.* ¶¶ 61-62. Even after the BOC gave written notification to DOC that it was operating one of the facilities in violation of the Minimum Standards, DOC continued to do so. *Id.* ¶ 63. Plaintiffs alleged that these practices emerged just as the BOC had announced new rules limiting DOC's power to use punitive segregation, and that the use of the Covered Facilities was designed to evade BOC's new restrictions on the use of solitary confinement. *Id.* ¶¶ 3, 63.

5. Defendants filed an answer on September 7, 2021, denying liability and asserting several affirmative defenses to liability.

6. On September 27, 2021, shortly after the Parties appeared before the Court for an Initial Case Management Conference, the Court referred the case for mediation with the Southern District of New York's mediation program, to proceed contemporaneously with discovery. ECF 45. Since that time, the Parties have conducted formal discovery and also engaged in extensive settlement negotiations, culminating in the execution of the Stipulation on April 12, 2023.

**Discovery and Settlement Negotiations**

7. The legal question presented in this case – whether the Defendants violated the substantive and procedural due process rights of Pretrial Detainees – is not susceptible to easy resolution. Plaintiffs' claims involve complex legal and factual inquiries, including: (1) the procedural and substantive due process principles that apply to the confinement of Class Members in the Covered Facilities; (2) the extent of procedural due process (if any) provided to Class Members before or after they were placed in the Covered Facilities; and (3) whether Defendants' purpose in confining Class Members in the Covered Facilities could be considered punitive. There is no controlling authority that answers those precise questions, and there are very few cases that address the constitutionality of similar conditions of confinement. Indeed, I and my co-counsel could not identify prior cases in which the specific legal and factual issues presented in this case have been litigated to conclusion.

8. As a result, the Parties held competing views about the correctness of their legal positions, but also acknowledged that there was uncertainty as to how the legal questions would ultimately be resolved.

9. As such, during settlement negotiations, the Parties focused their attention mainly on the following issues: negotiating the amount of damages for the class (measured as per diem compensation for each day spent in the Covered Facilities); determining membership in the class, in particular whether Defendants had a valid basis for placing any pretrial detainee in the Covered Facilities; agreeing on the appropriate Class Period, given questions about whether Defendants had changed their practice during the pendency of the litigation; production of documents and conducting depositions to enable Plaintiffs to understand Defendants' basis for placing people in the Covered Facilities; production of sufficient information to identify the Class Members; and ironing out the details of the notice and claims process.

10. The Parties engaged in substantial discovery. Plaintiffs' counsel interviewed numerous current and former DOC detainees, including but not limited to the named Plaintiffs, to understand the impact of confinement in the Covered Facilities. Plaintiffs served combined discovery demands and reviewed approximately 8,000 pages of documents, most of which bear on the identity of the Class Members, the Defendants' justifications for confinement of Pretrial Detainees in the Covered Facilities, the BOC's communication with DOC regarding use of the Covered Facilities, and the impact of being housed in the Covered Facilities on Plaintiffs. Plaintiffs' counsel conducted two site visits of the Covered Facilities, taking photographs and generally inspecting the facilities to better understand the conditions of confinement experienced by people incarcerated within them. In addition, Plaintiffs conducted depositions of DOC employees, to understand the retention of ESI documents and how DOC's practices regarding housing Pretrial Detainees in the Covered Facilities changed during the pendency of the litigation. Plaintiffs also sought information from the BOC via Freedom of Information Law requests and by reviewing a substantial amount of material maintained by the BOC on its website, including recordings of public meetings. The documents produced in discovery

revealed the nature and history of Defendants' practice of using the Covered Facilities to house so-called "problematic inmates."

11. Plaintiffs' counsel retained the services of one of the foremost experts on the psychiatric effects of isolation confinement. This expert reviewed discovery and conducted interviews with the named Plaintiffs.

12. Reviewing all of this information greatly assisted Plaintiffs' counsel in assessing the strengths and weaknesses of the case and in assessing the appropriate measure of damages for the putative Class.

13. Based on discovery produced by Defendants, Plaintiffs' counsel prepared extensive spreadsheets directed towards accurately calculating the amount of time spent in the Covered Facilities by each class member and the amount of compensation to which each class member was entitled.

14. While the Parties were conducting discovery, they also were engaged in intensive settlement negotiations. Most of these negotiations were conducted with the assistance of the Director of the Southern District of New York's mediation program, Rebecca Price. These negotiations took place over the course of more than a year. The bulk of the negotiations first concerned the amount of compensation each class member would receive for time spent in the Covered Facilities, any additional amount that particularly vulnerable class members would receive, and whether the City had any valid basis for placing any Pretrial Detainees in the Covered Facilities. By Fall 2022, the Parties had made progress in negotiating the amount of compensation, but had reached an impasse. That impasse was broken when the Parties accepted a mediator's settlement proposal in October 2022. ECF 68. The rest of the negotiations, which did not conclude until early April 2023, concerned the specific terms of the Stipulation, attached as Exhibit 1, and were conducted via video conference, telephone conference, and email. These

negotiations concerned the contents of the notice forms, posting of notice of the settlement, obligations of the Settlement Administrator, procedures by which Class Members could file challenges to the determination of their compensation, safeguards to ensure high participation rates by the Class, and the claims process.

15. Throughout the settlement negotiations, the Parties met with the mediator on the following dates: October 4, 2021; November 3, 2021; April 6, 2022; June 27, 2022; July 19, 2022; July 25, 2022; August 12, 2022; September 30, 2022; December 13, 2022; and January 12, 2023. Counsel for the Parties also met separately with the mediator on multiple occasions to facilitate discussions. The Parties also held several direct meet-and-confer sessions to discuss discovery and settlement without the mediator.

16. The outcome of the proposed settlement, as will be detailed herein, represents a fair and reasonable compromise of the Class Members' claims, particularly given the risks to the class of proceeding to trial.

**Adequacy of Compensation for the Class**

17. The Stipulation provides that Class Members will receive compensation in the amount of $400.00 per day (reduced by up to 25 percent for attorneys' fees and costs) for each day that any Class Member was held in a Covered Facility during the Class Period. *See* Stipulation ¶ 81. The per diem amount is increased to $450.00 (reduced by up to 25 percent for attorneys' fees and costs) for each day a person was housed in a Covered Facility when he was either diagnosed with a serious mental illness by DOC or under the age of 22. *See id.* ¶ 82. The increased per diem for these populations is justified by the substantial body of research demonstrating that they face heightened risk of harm from isolated confinement. *See* Craig Haney, Brie Williams, & Cyrus Ahalt, *Consensus Statement from the Santa Cruz Summit on Solitary Confinement and Health*, 115 NORTHWESTERN U. L. REV. 335, 339-43 (2020)

(summarizing literature regarding mentally ill and young people); *id*. at 347-48 (identifying guiding principle of limiting use of solitary confinement for mentally ill and juveniles); British Med. Ass'n, Royal Coll. Of Psychiatrists, & Royal Coll. Of Paediatrics & Child Health, JOINT POSITION STATEMENT ON SOLITARY CONFINEMENT OF CHILDREN AND YOUNG PEOPLE (2018), https://www.bma.org.uk/media/1859/bma-solitary-confinement-in-youth-detention-jointstatement-2018.pdf [https://perma.cc/4WYQ-DLUU] (calling for end to use of solitary confinement for children and young people); New York Advisory Committee to The U.S. Commission on Civil Rights, THE SOLITARY CONFINEMENT OF YOUTH IN NEW YORK: A CIVIL RIGHTS VIOLATION (Dec. 2014), available at https://www.nyc.gov/assets/boc/downloads/pdf/NYSAC%20to%20U.S.%20Commission%20on%20Civil%20Rights.pdf.  Indeed, the BOC itself recognized the heightened vulnerability of people under the age of 22 when it voted unanimously to bar the use of punitive segregation for that population.  *See* City of New York Board of Correction, Meeting Minutes at 9-15 (Jan 13, 2015), available at https://www.nyc.gov/assets/boc/downloads/pdf/BOCMinutes%20(1.13.15).pdf (discussing Board's unanimous vote to end solitary confinement for people under the age of 22).

   18. The Stipulation provides that Pretrial Detainees will not be compensated for days spent in the Covered Facilities during the Class Period in two circumstances.  First, if a Pretrial Detainee was held in West Facility for 14 or fewer consecutive days on or after February 1, 2020 because he was referred to West Facility for contagious disease reasons by Correctional Health Services ("CHS"), this so-called "Contagious Disease Time" will not be compensable under the Stipulation.  Stipulation ¶¶ 20-22.  The Parties agreed to this term to reflect the fact that with the onset of the COVID-19 pandemic, DOC sometimes used confinement in West Facility, which is a contagious disease unit, to contain the spread of COVID-19.

19. Second, the Stipulation excludes from compensable time any days spent in a Covered Facility by a Pretrial Detainee pursuant to a judicial order issued by a court of competent jurisdiction requiring the person to be housed separately from other incarcerated people for security purposes. Stipulation ¶¶ 20-22. This time is referred to as "Lock-Down Time" in the Stipulation and is excluded from compensable time because Defendants were required to comply with the court orders and therefore had a legitimate reason for the housing placement, distinguishing these Pretrial Detainees from other Class Members.

20. Discovery revealed that there are 4,413 known class members. *See* Ex. A to Stipulation. The average award that class members will be eligible to receive under the settlement is approximately $12,000 (reduced by up to 25 percent for attorneys' fees and costs). The anticipated maximum total amount (inclusive of attorney's fees and costs) that will be paid under the settlement is $53,018,550.00. Stipulation ¶ 85.

21. The per diem amount paid under the settlement is comparable to (if not higher than) similar settlements and judgments Plaintiffs' counsel have been able to identify. In the *Parker* case brought against the City by the undersigned and Cuti Hecker Wang LLP, class members received less for each day of confinement in the harsher conditions of punitive segregation – a per diem of $175.00 per day for most class members, increased to $200.00 per day for class members who were diagnosed with a serious mental illness or who were under the age of 18. *Parker v. City of New York*, No. 15 CV 6733, 2018 WL 6338775, at *2 (E.D.N.Y. Dec. 4, 2018). Other cases involving solitary confinement that have been litigated to trial support the fairness of this settlement. For example, in *Almighty Supreme Born Allah v. Milling*, No. 11 Civ. 668, 2016 WL 1311997 (D. Conn. Apr. 4, 2016), the court awarded damages after trial of $175.00 per day for a pretrial detainee who established that he was wrongfully confined in solitary confinement in Connecticut. Notably, that decision was reversed on appeal on

qualified immunity grounds. *Almighty Supreme Born Allah v. Milling*, 876 F.3d 48 (2d Cir. 2017). And a prisoner who challenged a similar policy in Massachusetts was awarded $100.00 per day by the court, with that judgment also reversed on qualified immunity grounds. *Ford v. Bender*, No. 07 Civ. 11457, 2012 WL 262532, at *16 (D. Mass. Jan. 27, 2012), *vacated and reversed*, 768 F.3d 15 (1st Cir. 2014). Most recently, a court in this District entered a default judgment of $200.00 per day in compensatory damages for a convicted individual with mental illness who was wrongfully held in solitary confinement. *See Greenburger v. Roundtree*, No. 17 Civ. 03295, 2020 WL 6561598, at *9 (S.D.N.Y. Jan. 16, 2020), *report and recommendation adopted*, 2020 WL 4746460 (S.D.N.Y. Aug. 16, 2020). Most cases involving procedural due process claims by convicted individuals who establish that they were wrongfully placed in solitary confinement result in smaller judgments of between $25.00 and $125.00 per day. *See, e.g.*, *McClary v. Coughlin*, 87 F. Supp. 2d 205, 218 (W.D.N.Y. 2000), *aff'd sub nom. McClary v. Kelly*, 237 F.3d 185 (2d Cir. 2001) (reducing jury award to $125.00 per day and surveying case law); *Pino v. Dalsheim*, 605 F. Supp. 1305, 1319 (S.D.N.Y. 1984) (awarding $25.00 per day). Although there are also cases in which people in prisons and jails received greater compensation for wrongful confinement in solitary confinement, these usually involved particularized facts demonstrating increased injury. *See, e.g.*, *Simmons v. Cook,* 154 F.3d 805, 809 (8th Cir. 1998) (upholding $2,000 damage award for paraplegic inmates placed in solitary confinement for thirty-two hours because "the facts in this case are sufficiently egregious" to justify higher than average award); *Maurer v. Patterson*, 197 F.R.D. 244 (S.D.N.Y 1999) (finding that jury award of $25,000 (equaling $833.00 per day) in compensatory damages did not shock the conscience for plaintiff who wrongfully served 30 days in solitary confinement as retaliation).

22. In most damages class action cases, it is unusual for class settlements to provide full compensation to injured class members. Here, although Plaintiffs' counsel believe that it is

9

possible that a trial would result in a larger award for some individual Class Members, the settlement itself provides what many other fact finders have found to be full compensation in similar circumstances.  The settlement also provides benefits that likely would not have been available had Plaintiffs obtained a favorable judgment at trial, such as a limitation on the liens and judgments that can be asserted against a Class Member's award and counseling to assist Class Members in determining whether an award will affect their public benefits.  Stipulation ¶¶ 161, 165.

23.     There are class actions in which a court may suspect that the proposed settlement did not result from arm's-length negotiations because the parties agreed that class counsel will receive a percentage of the total fund no matter how much of that total fund is actually paid to class members.  But that is not the case here.  Here, Plaintiffs' counsel will receive only a percentage of the total recovery that is actually paid to the class, ensuring that attorneys' fees bear a direct relation to the benefit created by counsel's efforts, thus directly aligning Plaintiff's counsel's interests with those of the Class.  Plaintiffs' counsel will seek no more than 25 percent of the total recovery obtained by the Class, and only after application to this Court in due course. Stipulation ¶ 95.

**Fairness of the Notice and Claims Procedure**

24.     In any opt-out class action in which class members must file a claim to receive compensation, there is a concern that there will be insufficient participation by the class in the claims process, in part because of the possibility that correspondence regarding the settlement will not reach absent class members.  Here, however, there are several reasons to believe that the participation rate will be high.

25.     First, Plaintiffs expect that a significant percentage of the class members remain in New York State or New York City custody and therefore are likely to be easy to contact.  This

is based on Plaintiffs' Counsel's experience in the *Parker* class action, in which more than 40 percent of people who had been held as pretrial detainees during the relevant class period were located in custody during the notice period.  As to these individuals, the claims process will be straightforward and, should difficulties arise in understanding or completing the claims process, the Administrator and Plaintiffs' counsel will be available to offer assistance.

26. Second, as to individuals who are not currently in custody, the Stipulation provides several safeguards to ensure that information about the settlement reaches them.  The City has extensive personal information about each Class Member that should ensure accurate last known address information, including by consulting DOC records and databases maintained by the New York City Department of Probation and the New York City Department of Social Services.  Stipulation ¶ 105.  The Administrator will determine the best address by consulting the City's information as well as a national change of address database and the CLEAR database maintained by Thomson Reuters.  *Id.* ¶ 106.  To the extent that any correspondence is returned to the Administrator for an incorrect address, the following measures will be taken:  first, the administrator shall promptly carry out a second round of address research, including using CLEAR, to attempt to identify a better address match, and if that is not successful, Class Counsel will make additional efforts to locate the class member.  *Id.* ¶¶ 122-23; 126-28.

27. Moreover, if fewer than 75% of class members have responded in some form to the class notice (by filing a claim or opting out), the deadline by which Class Members must respond will be extended by 120 days.  *Id.* ¶¶ 47, 52, 60.  During that time, Class Counsel will be able to attempt to correspond with Class Members to assist them in filing eligible claims, opt out, or to answer questions regarding the settlement.  Plaintiffs' Counsel insisted on including this provision because of the difficulty formerly incarcerated people often face in maintaining stable housing.  *See, e.g., How Do People Released From Prison Find Housing?* N.Y. Times (March

11

20, 2023), available at https://www.nytimes.com/2023/03/20/realestate/prison-parole-housing-shelters.html. Plaintiffs' Counsel negotiated a similar provision in the *Parker* settlement, which was instrumental in securing the high participation rate in that class action. In *Parker*, approximately forty six percent of the class members responded by the initial deadline, triggering the extended deadline, ultimately resulting in an eighty percent participation rate.

28. Third, Plaintiffs' counsel expects that Class Members who receive adequate notice of the settlement are likely to participate, given its favorable terms and the fact that almost no other similar claims have been successfully litigated on behalf of individual DOC detainees in the past.

29. Fourth, although the Parties are confident that they have identified substantially all of the eligible Class Members through discovery and accurately calculated their compensation under the agreement, the Stipulation contains a challenge procedure that serves to protect the Class. For individuals who receive notice of the settlement (which will be prominently posted in DOC facilities as well as New York City Department of Probation, New York City Administration for Children's Services, and New York City HRA offices) but who are not on the Class List, there will be an opportunity to show that they are eligible class members and entitled to compensation. Stipulation ¶¶ 132-33. For individuals who are on the Class List, but who think they are entitled to more compensation (either because they served more time in the Covered Facilities than the parties calculated or because they were under 22 or diagnosed with a serious mental illness at the time, or because they did not serve Contagious Disease Time or Lock-Down Time), there is a similar procedure to file a challenge. *Id.*

30. The City has the option to withdraw from the settlement if, after all claims have been filed and all challenges resolved, it is obligated to pay more than 107.5% of the anticipated maximum total payout. *Id.* ¶ 167. This eventuality is highly unlikely to occur, as it would

require the combination of close to 100% participation by the class members plus a significant number of successful challenges.

### Role of Named Plaintiffs and Justification for Incentive Awards

31. The Parties also have agreed to seek an incentive award of $20,000.00 for each of the named Plaintiffs. *Id.* ¶ 176. This is to recognize the significant risk they took in maintaining this action and their role in providing Plaintiffs' counsel with information about the operation of the Covered Facilities.

32. The named Plaintiffs spoke numerous times with Plaintiffs' counsel and Plaintiffs' retained psychiatric expert to assist them in better understanding the impact of being housed in the Covered Facilities and their operation. The named Plaintiffs answered Defendants' formal discovery demands as well, including signing HIPAA releases and producing their medical records.

33. It also is significant that on July 11, 2022, Defendants served each then-named Plaintiff with Offers of Judgment pursuant to FRCP 68. Fully understanding the personal risks presented by declining these offers because of cost-shifting rules, five of the seven named Plaintiffs declined those Offers of Judgment, permitting the class action to proceed and providing significant benefit to the absent Class Members.

### Adequacy of Class Counsel

34. Plaintiffs' counsel have extensive experience litigating prisoners' civil rights cases, including in the class action context.

35. I graduated *magna cum laude* from New York University School of Law in 1999, where I was a member of Order of the Coif and a Root-Tilden-Kern Scholar. After graduating from law school, I clerked for two federal judges: Harry T. Edwards of the D.C. Circuit Court of Appeals and Stephen G. Breyer of the United States Supreme Court. After my clerkships, I

worked as an associate at Koob & Magoolaghan until 2007, when I became a law professor at the Benjamin N. Cardozo School of Law.

36. I have been litigating cases involving the rights of incarcerated people for more than 20 years, first as an associate at Koob & Magoolaghan and then, after becoming a law professor, litigating as co-counsel with civil rights law firms and non-governmental organizations. These cases include: (1) *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), in which I was lead counsel for plaintiffs from the initiation of the case in the Eastern District of New York to counsel of record in the United States Supreme Court; (2) *Peoples v. Annucci*, 180 F. Supp. 32 294 (S.D.N.Y. 2016), a class-action in which I was co-counsel for plaintiffs with the New York Civil Liberties Union and Morrison & Foerster; (3) *Ziglar v. Abbasi*, 137 S. Ct. 1843 (2017), in which I was co-counsel for plaintiffs in the United States Supreme Court with the Center for Constitutional Rights and Covington & Burling LLP; (4) *Scott v. Quay*, 338 F.R.D. 178 (E.D.N.Y. 2021), a class-action in which I am co-counsel for plaintiffs with the Benjamin N. Cardozo School of Law Civil Rights Clinic and the law firm Emery Celli Brinckerhoff Abady Ward & Maazel LLP; (5) *Shariff v. Goord*, 235 F.R.D. 563 (W.D.N.Y. 2006), a class-action in which I was lead counsel for plaintiff; (6) *McGowan v. United States*, 825 F.3d 118 (2d Cir. 2016), in which I was appellate counsel for plaintiff; and (7) *Hilton v. Wright*, 235 F.R.D. 40 (N.D.N.Y. 2006), a class action in which I was lead counsel for plaintiffs. Most relevant, I was co-counsel with Cuti Hecker Wang LLP for plaintiffs in the class action *Parker v. City of New York,* No. 15 Civ. 6733, 2018 WL 6338775 (E.D.N.Y. Dec. 4, 2018), a class action in which class counsel obtained damages for incarcerated people who were wrongly held in solitary confinement by DOC. Five of these cases (*Abbassi*, *Iqbal, McGowan*, *Parker, and Peoples*) involved issues relating to isolated confinement.

37. I also frequently am invited to lecture and train lawyers, judges, and judicial law clerks on issues relating to isolated confinement, the rights of incarcerated people, and Section 1983 litigation. Some examples include the following:

   a. *Municipal Liability: Policymakers*, 39th Annual PLI Section 1983 Training, New York, New York (November 3, 2022)
   b. *Eight and Fourteenth Amendment Section 1983 Claims*, District Court for the District of Nevada Pro Bono Program, Nevada, Las Vegas (July 12, 2022) (virtual event)
   c. *New Developments in the Law of Section 1983*, Federal Judicial Center Court Web Lecture, Washington, D.C. (May 24, 2022) (virtual event)
   d. *Municipal Liability Update*, 38th Annual PLI Section 1983 Training, New York, New York (October 28, 2021)
   e. *Section 1983 Pleadings Issues*, 37th Annual PLI Section 1983 Training, New York, New York (October 16, 2020)
   f. *Section 1983: Immunities, Remedies, and Defenses*, Second Circuit Staff Attorney Training, New York, New York (May 23, 2019; July 20, 2017)
   g. *The State of Mind Requirement in Section 1983 Cases*, Law Clerk Video Conference on Issues in 42 U.S.C. § 1983 Litigation, Federal Bar Council, New York, New York (November 28, 2018; November 28, 2017; November 16, 2016; December 2, 2015; November 19, 2014; January 15, 2014; November 29, 2013; November 29, 2011; November 30, 2010)
   h. *Supervisory Liability and Ashcroft v. Iqbal*, 35th Annual PLI Section 1983 Training, New York, New York (October 25, 2018)
   i. *The Art of Pleading: Civil Rights & Employment Law After* Iqbal, Eastern District of Michigan Federal Bar Association, Detroit, Michigan (March 23, 2018).
   j. *Anatomy of a Section 1983 Wrongful Conviction Case*, 34th Annual PLI Section 1983 Training, New York, New York (October 26, 2017)
   k. *Plausibility Pleading Practices: 7 Years Post-Iqbal, Red Flag or Red Herring*, Federal Bar Association, Civil Rights Section, New York, New York (Feb 16, 2017)
   l. *Abuse of State Power*, 33rd Annual PLI Section 19983 Training, New York, New York (September 29, 2016)
   m. *Update on the Law of Incarcerated Persons*, Wm. Matthew Byrne, Jr., Judicial Clerkship Institute, Federal Judicial Center, Malibu, California (March 18, 2016)
   n. *The Law of Incarcerated Persons*, Federal Judicial Center Court Web Lecture, Washington, D.C. (May 20, 2015))
   o. *Prisoner Litigation: Pleading Standards and Causes of Action*, 2015 Joint First, Second, and Third Circuit *Pro Se* Conference, New Paltz, New York (February 25, 2015)
   p. *Prisoners' Rights*, Second Circuit Pro Se Office Training Seminar, New York, New York (November 19, 2013; November 30, 2012; October 25, 2011; October 26, 2010)

38.     I also have offered testimony regarding isolated confinement issues to the New York City Council, the New York City Board of Correction, and the New York State Advisory Committee to the United States Commission on Civil Rights. I have offered testimony regarding civil rights and Section 1983 to the House of Representatives Subcommittee on the Constitution and Civil Justice, Committee on the Judiciary.

39.     I am admitted to practice in New York State and the following federal courts: the Southern, Eastern, and Western Districts of New York; the United States Court of Appeals for the First, Second, and Fourth Circuits; and the United States Supreme Court. I also have served as a panel member of the Second Circuit's Pro Bono Panel, beginning in 2019.

40.     Eric Hecker, my co-counsel, is a partner at Cuti Hecker Wang LLP. He graduated *magna cum laude* from the University of Michigan Law School in 1997, where he was a member of the Order of the Coif and an Articles Editor on the *Michigan Law Review*. After graduating from law school, he clerked for three federal judges: David Tatel of the United States Court of Appeals for the District of Columbia Circuit, Thelton Henderson of the United States District Court for the Northern District of California, and the late Constance Baker Motley of this Court. From 2002 through 2010, he was an associate (2002-2005) at Emery Celli Cuti Brinckerhoff & Abady LLP, and then a partner (2006-2010) at Emery Celli Brinckerhoff & Abady LLP. In 2011, he co-founded Cuti Hecker Wang LLP with two other former Emery Celli Brinckerhoff & Abady LLP partners, John Cuti and Mariann Wang.

41.     Mr. Hecker has extensive experience representing clients in a diverse array of civil rights cases. For example, he served as lead counsel to the New York Senate Democrats with respect to all aspects of the redistricting process following both the 2010 Census and 2020 Census. He has served as lead counsel in many other civil rights cases, including many cases involving prisoners' rights issues. He taught a course in Election Law at the Benjamin N.

Cardozo School of Law each year from 2005 to 2015. Mr. Hecker also represented a putative class of plaintiffs bringing a systemic constitutional challenge to the adequacy of the foster care system in Minneapolis. *See T.F. et al. v. Hennepin County et al.,* 17-cv-01826-PAM-BRT (D. Minn.). While at his former firm, Mr. Hecker worked on several civil rights class actions, including *Tyson v. City of New York*, 97-cv-3762 (S.D.N.Y.), and *McBean v. City of New York*, 02-cv-05426 (S.D.N.Y.).

42. John Cuti, my co-counsel, is also a partner at Cuti Hecker Wang LLP. He graduated *cum laude* from the New York University School of Law where he was a member of the Order of the Coif. After spending several years as a public defender at the Neighborhood Defender Service of Harlem, where he obtained extensive knowledge of conditions of confinement at DOC facilities, Mr. Cuti went on to be one of the founding partners of Emery Celli Cuti & Brinckerhoff in 1997. While at Emery Celli, Mr. Cuti litigated a class action in this Court involving the City's policy of blanket strip searching misdemeanor arrestees, *see Tyson v. City of New York*, 97-cv-3762 (S.D.N.Y.), and handled numerous civil rights cases, including *Jacobs v. Seminole County Canvassing Board*, 773 So. 2d 519 (Fla. 2000), where he served as trial counsel in a challenge to the Seminole County absentee ballot application process as part of the statewide Democratic Party challenge to the 2000 presidential election in Florida, and in *McCain v. Powers* and *Rockefeller v. Powers* (E.D.N.Y.), where, as co-counsel with the Brennan Center for Justice, he successfully represented 2000 and 1996 presidential candidates John McCain and Steve Forbes in constitutional challenges to New York's ballot access laws, and numerous other matters involving claims arising under the Constitution or civil rights statutes.

43. Two other experienced lawyers at Cuti Hecker Wang played substantial roles in this litigation. Alexander Goldenberg is a partner at Cuti Hecker Wang, where he has worked since 2011. He graduated *magna cum laude* from the New York University School of Law in

2007, where he was a member of Order of the Coif.  After graduating from law school, he clerked for Chief Judge Dennis Jacobs of the U.S. Court of Appeals for the Second Circuit and for Judge Jan E. DuBois in the United States District Court for the Eastern District of Pennsylvania. After his clerkships and before joining Cuti Hecker Wang, Mr. Goldenberg worked at the Equal Justice Initiative in Montgomery, Alabama, where he represented criminal defendants in state and federal courts in capital cases and other felony appeals.  Mr. Goldenberg has successfully represented clients who suffered employment and housing discrimination, wage and hour violations, police misconduct and prisoner abuse, and sexual assault.

44. Daniel Mullkoff is a 2010 graduate of Yale Law School who was an associate at Cuti Hecker Wang LLP since 2014 (becoming partner earlier this year).  Before that, he spent two years at the New York Civil Liberties Union, where he focused on police misconduct issues, including a class action challenging aspects of the New York City Police Department's stop-and-frisk program.  He also litigated cases challenging the use of solitary confinement and First Amendment violations.  Prior to joining the NYCLU, he clerked for Judge Keith P. Ellison on the United States District Court for the Southern District of Texas.  With the undersigned and Mr. Hecker, Mr. Mullkoff was appointed class counsel in *Parker v. City of New York,* No. 15 Civ. 6733 (E.D.N.Y.), involving similar claims brought against DOC on behalf of pretrial detainees.

**Qualifications of Rust as Administrator**

45. The Parties agreed to engage Rust as Administrator after Plaintiffs' Counsel solicited proposals from potential claims administrators with experience administering similar class actions.  Rust's proposal was comprehensive and provided ample provisions to protect the interests of the class.  Rust is a nationally recognized notice and administration firm with the capacity and experience to manage administering a class action of this size and complexity.  Rust

has been appointed to administer the proposed class action in *Jones v. City of New York*, 17 Civ. 7577 (S.D.N.Y.), an action involving a similar population of people formerly confined in DOC facilities. Plaintiffs' Counsel is confident based on Rust's extensive experience that Rust will serve the class well. Rust has provided a separate Declaration, included with Plaintiffs' motion papers, attesting to the steps it will undertake to administer the settlement in conformance with the Parties' agreement. *See* Declaration of Kristen Stallings Regarding Settlement Administration dated April 18, 2023.

46. I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Dated: New York, New York
April 19, 2023

_____
Alexander A. Reinert