UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------X

DAHKEEM MILLER; JOSE GUITY;                     Case No. 21-cv-2616 (PKC) (JW)
TRAVIS BUTLER; ARIAN PERALTA;
GARY GARCIA, JR.; BOBBY DEE
CRUZ, and ISAIAH MUHAMMAD,
on their own behalf and on behalf
of others similarly situated,

                    Plaintiffs,

           -v-

CITY OF NEW YORK; CYNTHIA BRANN;
TIMOTHY FARRELL; HAZEL JENNINGS;
and BRENDA COOKE,

                    Defendants.

------------------------------------------------------X

# CLASS COUNSEL'S MEMORANDUM OF LAW
## IN OPPOSITION TO THE CITY CHALLENGES

Eric Hecker                          Alexander A. Reinert
John R. Cuti                         55 Fifth Avenue, Room 1005
Alexander Goldenberg                 New York, NY 10003
Daniel Mullkoff                      (646) 592-6543
Jazly Liriano
CUTI HECKER WANG LLP                 *Attorneys for Plaintiffs*
305 Broadway, Sixth Floor
New York, NY 10007
(212) 620-2600

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ................................................................................... iii

PRELIMINARY STATEMENT ............................................................................. 1

ARGUMENT ......................................................................................................... 2

I.    THE PRE-TRIAL CHALLENGES HAVE NO MERIT ................................. 2

    A.    The City Failed to Produce the Critical QHIN Reports ........................... 3

    B.    The City's Summary Spreadsheets Do Not Satisfy Its Burden .............. 5

    C.    The Pre-Trial Challenges Cannot Be Squared with the Definition of
        "Pre-Trial Detainee" In the Stipulation ................................................... 7

    D.    Certain Pre-Trial Challenges Should Be Rejected Because the Class Members
        Were Pre-Trial Detainees Even Under the City's Reading ..................... 9

    E.    One Pre-Trial Challenge Is Untimely ...................................................... 10

II.   THE RELEASE CHALLENGES HAVE NO MERIT .................................... 10

    A.    New York Law Prohibits the Use of Broadly Worded Releases to
        Bar the Claims in This
        Action…………………………………………………………...……………..11

        1.    The Boilerplate Language Contained in the Releases Is Insufficient to Bar
            Participation in This Class Action Settlement…………………………11

        2.    The Context in Which the Releases Were Negotiated Militates Strongly
            Against Applying Them to Bar Claims in This Class Action…………..……14

    B.    Applying the Releases to Bar Claims in This Case Would Raise Serious
        Constitutional Questions…………………………………………...……………22

    C.    The City's Releases Executed After This Action Was Filed are Prohibited by
        F.R.C.P. 23(d) and New York Law…………………………………………..…25

    D.    The Court Should Refuse to Enforce Releases Executed by Individuals Who the
        City Itself Designated as Having a Serious Mental Illness………………………...36

    E.    The Court Should Refuse to Enforce Releases Executed by Individuals Who Were
        Unrepresented……………………………………………………...………………36

F.   The Court Should Reject Untimely Release Challenges……………………………..37

CONCLUSION ...................................................................................................................... 39

# TABLE OF AUTHORITIES

## CASES

*Abascal v. Fleckenstein,*
   820 F.3d 561 (2d Cir. 2016) ................................................................. 5

*Actrade Fin. Techs., Ltd.,*
   424 B.R. 59 (Bankr. S.D.N.Y. 2009) ............................................. 15, 16

*Agency for International Development v. Alliance for Open Society International, Inc.,*
   570 U.S. 205 (2013) ...................................................................... 22, 23

*Alicea v. City of New York,*
   2023 WL 3724131 (S.D.N.Y. May 30, 2023) ...................................... 13

*Augustin v. The City of New York,*
   2022 WL 1081235 (Sup. Ct., Kings Cty. Mar. 31, 2022) ...................... 17

*Auten v. Auten,*
   308 N.Y. 155 (1954). ......................................................................... 11

*Balasanyan v. Nordstrom, Inc.,*
   2012 WL 760566 (S.D. Cal. Mar. 8, 2012) ................................... 25, 33

*Benjamin v. Fraser,*
   264 F.3d 175 (2d Cir. 2001) ................................................................. 9

*Benjamin v. Horn,*
   2008 WL 2462027 (S.D.N.Y. June 18, 2008). .................................. 4, 5

*Best v. Yutaka,*
   90 N.Y.2d 833 (1997) .......................................................................... 21

*Bolling v. City of New York,*
   2021 WL 961758 (S.D.N.Y. Mar. 15, 2021) ........................................ 13

*Brown v. Mustang Sally's Spirits & Grill, Inc.,*
   2012 WL 4764585 (W.D.N.Y. Oct. 5, 2012) ........................................ 26

*Burford v. Cargill,*
   2007 WL 81667 (W.D. La. 2007) ........................................................ 28

*Bushkin, Gaims, Gaines, Jonas & Stream v. Garber,*
   677 F. Supp. 774 (S.D.N.Y. 1988) ..................................................... 18

*Cahill v. Regan*,
   5 N.Y.2d 292 (1959) ............................................................................................. 15, 17

*Callahan v. Callahan*,
   127 A.D.2d 298 (3rd Dep't 1987) ........................................................................ 33

*Campos v. Aegis Realty Mgmt. Corp.*,
   2020 WL 433356 (S.D.N.Y. Jan. 28, 2020) ................................................... 12, 16

*Chen-Oster v. Goldman, Sachs & Co.*,
   449 F. Supp. 3d 216 (S.D.N.Y. 2020).................................................................. 30

*Cheverez v. Plains all Am. Pipeline, LP*,
   2016 WL 861107 (C.D. Cal. Mar. 3, 2016)........................................................ 26

*Cheverez v. Plains all Am. Pipeline, LP*,
   2016 WL 861107 (C.D. Cal. Mar. 3, 2016)........................................................ 28

*Chiappone v. North Shore University Hospital*,
   164 A.D.3d 463 (2d Dep't 2018) .................................................................... 18, 19

*Cornet v. Twitter, Inc.*,
   2022 WL 18396334 (N.D. Cal. Dec. 14, 2022) ................................................. 27

*CSI Inv. Partners II, L.P. v. Cendant Corp.*,
   507 F. Supp. 2d 384, 420 (S.D.N.Y. 2007), *aff'd*, 328 F. App'x 56 (2d Cir. 2009).................. 6

*Currency Conversion Fee Antitrust Litig.*,
   361 F. Supp. 2d 237, 252 (S.D.N.Y. 2005)……………………………....……..26, 27, 30, 31

*Decosta v. Williams*,
   119 Misc. 2d 314 (Sup. Ct., Kings Cty. 1983)..................................................... 19

*Dial Corp. v. News Corp.*,
   2015 WL 9256930 (S.D.N.Y. Nov. 16, 2015 ..................................................... 27

*Dolan v. City of Tigard*,
   512 U.S. 374 (1994)............................................................................................. 23

*Dury v. Dunadee*,
   52 A.D.2d 206 (4th Dep't 1976) ...................................................................... 16, 17

*Eshelman v. OrthoClear Holdings, Inc.*,
   2007 WL 2572349 (N.D. Cal. Sept. 4, 2007) ..................................................... 31

*Estes v. New York State Saddle Horse Ass'n Inc.*,
    188 A.D.2d 857 (3d Dep't 1992) ................................................................. 14

*Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt. LLC*,
    371 F. Supp. 2d 571 (S.D.N.Y. 2005) ......................................................... 8

*Gardstein v. Kemp & Beatley, Inc.*,
    1987 WL 7378 (S.D.N.Y. Feb. 20, 1987) ............................................. 15, 16

*Glassberg v. Lee*,
    82 A.D.3d 836 (2d Dep't 2011) ................................................................. 12

*Gonzalez v. Preferred Freezer Services LBF, LLC*,
    2012 WL 4466605 (C.D. Cal. 2012) ......................................................... 30

*Gortat v. Capala Bros.*,
    2010 WL 1879922 (E.D.N.Y. May 10, 2010) ........................................... 32

*Gulf Oil Co. v. Bernard*,
    452 U.S. 89 (1981) ..................................................................................... 25

*Harris v. McRae*,
    448 U. S. 297 (1980 ................................................................................... 23

*Haynes v. Garez*,
    304 A.D.2d 714 (2d Dep't 2003) ......................................................... 18, 22

*Hinds County v. Wachovia Bank N.A.*,
    790 F. Supp. 2d 125 (S.D.N.Y. 2011) ....................................................... 26

*Huang v. Llerena-Salazar*,
    222 A.D.3d 1033 (2d Dep't 2023) ............................................................. 19

*Interpool Ltd. v. Patterson*,
    1993 WL 410465 (S.D.N.Y. Oct. 8, 1993) ............................................... 13

*Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*,
    655 B.R. 149 (Bankr. S.D.N.Y. 2023) ..................................................... 14

*Johnson v. City of New York*,
    2023 WL 5629232 (S.D.N.Y. Aug. 31, 2023) ......................................... 13

*Johnson v. Lebanese Am. Univ.*,
    84 A.D.3d 427 (1st Dep't 2011) ............................................................... 21

*Johnson v. Thruway Speedways, Inc.*,
    63 A.D.2d 204 (3d Dep't 1978) .................................................................. 14

*Jones v. Jeld-Wen, Inc.*,
    250 F.R.D. 554 (S.D. Fla. 2008) ................................................................ 32

*Jubinville v. Hill's Pet Nutrition, Inc.*,
    2019 WL 1584679 (D.R.I. Apr. 12, 2019) ................................................ 32

*Kater v. Churchill Downs, Inc.*,
    423 F. Supp.3d 1055 (W.D. Wash. 2019) ................................................. 25

*Kaufman v. Microsoft Corp.*,
    2020 WL 364136 (S.D.N.Y. Jan. 22, 2020) ............................................... 8

*Kirchner v. New Home Sewing Mach. Co.*,
    135 N.Y. 182 (1892). ................................................................................. 34

*Lefrak SBN Assocs. v. Kennedy Galleries, Inc.*,
    203 A.D.2d 256 (2d Dep't 1994) .............................................................. 22

*Legal Services Corp. v. Velazquez*,
    531 U.S. 533 (2001), ................................................................................. 24

*Li v. A Perfect Day Franchise, Inc.*,
    270 F.R.D. 509 (N.D. Cal. 2010) ............................................................. 26

*Lloyd v. City of New York*,
    2017 WL 2266876 (S.D.N.Y. May 22, 2017) .......................................... 14

*Maddaloni Jewelers, Inc. v. Rolex Watch U.S.A., Inc.*,
    354 F. Supp. 2d 293 (S.D.N.Y. 2004) ...................................................... 14

*Mangini v. McClurg*,
    24 N.Y.2d 556 (1969) ......................................................................... 12, 14

*Marino v. CACafe, Inc.*,
    2017 WL 1540717 (N.D. Cal. Apr. 28, 2017) ..................................... 28, 29

*Mateo v. Carinha*,
    799 F. App'x 51 (2d Cir. 2020) ................................................................ 13

*Mazzurco v. PII Sam, LLC*,
    153 A.D.3d 1341 (2d Dep't 2017) ............................................................ 12

vi

*Mohegan Lake Motors, Inc. v. Maoli*,
  2017 WL 6335905 (S.D.N.Y. Dec. 7, 2017) ............................................. 34

*Nollan v. California Coastal Commission*,
  483 U.S. 825 (1987) ................................................................................. 23

*O'Conner v. Agilant Solutions, Inc.*,
  444 F. Supp. 3d 593 (S.D.N.Y. 2020) ...................................................... 30

*O'Connor v. Uber Techs. Inc.*,
  2013 WL 6407583 (N.D. Cal. Dec. 6, 2013) ....................................... 27, 32

*O'Connor v. Uber Techs., Inc.*,
  2014 WL 1760314 (N.D. Cal. May 2, 2014) .............................................. 28

*Oakes v. Patel*,
  20 N.Y.3d 633 (2013) ............................................................................... 21

*Olin Corp. v. Consol. Aluminum Corp.*,
  5 F.3d 10 (2d Cir. 1993)............................................................................ 11

*Parker v. City of New York*,
  15 Civ. 6733 (E.D.N.Y.) ............................................................................. 5

*Paulino v. Braun*,
  170 A.D.3d 506 (1st Dep't 2019) .............................................................. 19

*Peralta v. City of New York*,
  2022 WL 17832324 (S.D.N.Y. Dec. 21, 2022) ......................................... 12

*Pickarski v. Amedisys Ill., LLC*,
  4 F. Supp. 3d 952 (N.D. Ill. 2013) ............................................................ 27

*Pinto v. Allstate Ins. Co.*,
  221 F.3d 394 (2d Cir. 2000)...................................................................... 14

*Portillo v. Nat'l Freight, Inc.*,
  2021 WL 3486894 (D.N.J. Aug. 9, 2021) ............................................. 28, 32

*Potamkin Cadillac Corp. v. B.R.I. Coverage Corp.*,
  38 F.3d 627 (2d Cir. 1994)........................................................................... 6

*Reed v. Scientific Games Corp.*,
  2021 WL 2473930 (W.D. Wash. June 17, 2021)........................................ 29

*Rogers v. WEBstaurant Store, Inc.*,
  2018 WL 3058882 (W.D. Ky. June 20, 2018) ....................................................................... 30

*Singleton v. City of New York*,
  2023 WL 6066250 (S.D.N.Y. Sept. 18, 2023) ....................................................................... 14

*Smith v. New York*,
  2014 WL 6783194 (E.D.N.Y. Dec. 2, 2014) ......................................................................... 36

*Sorrentino v. ASN Roosevelt Ctr. LLC*,
  584 F. Supp. 2d 529 (E.D.N.Y. 2008) .................................................................................. 27

*Staples v. Acolatza*,
  2016 WL 4533560 (S.D.N.Y. Mar. 9, 2016) .......................................................................... 13

*Sterling Nat. Bank v. Israel Disc. Bank of New York*,
  305 A.D.2d 184 (1st Dep't 2003) ......................................................................................... 33

*Syville v. City of New York*,
  2023 U.S. Dist. LEXIS 232434 (S.D.N.Y. Dec. 20, 2023) ..................................................... 13

*Torres Romero v. May Trucking Co.*,
  2018 WL 5905604 (C.D. Cal. Feb. 21, 2018) ........................................................................ 28

*TVT Records v. Island Def Jam Music Grp.*,
  412 F.3d 82 (2d Cir. 2005) .................................................................................................. 34

*U.S. Bank Nat'l Ass'n v. BFPRU I, LLC*,
  230 F. Supp. 3d 253 (S.D.N.Y. 2017) ................................................................................... 34

*United States v. Bonomolo*,
  566 F. App'x 71 (2d Cir. 2014) ............................................................................................. 6

*United States v. Feliz*,
  467 F.3d 227 (2d Cir. 2006) .................................................................................................. 6

*United States v. Weigand*,
  2021 WL 568173 (S.D.N.Y. Feb. 14, 2021) ........................................................................... 5

*Valdiviezo v. Greer*,
  787 F. App'x 48 (2d Cir. 2019) ............................................................................................. 13

*Vornado Realty Trust v. Castleton Env't. Contractors, LLC*,
  2011 WL 4592800 (E.D.N.Y. Sept. 30, 2011) ....................................................................... 13

*Weinstein v. Jenny Craig Operations*,
    132 A.D.3d 446 (1st Dep't 2015) ........................................................... 33

*Williams v. Securitas Sec. Servs. USA, Inc.*,
    2011 WL 2713741 (E.D. Pa. July 13, 2011)............................................... 27

*Zamboni v. Pepe W. 48th St. LLC*,
    2013 WL 978935 (S.D.N.Y. Mar. 12, 2013) ............................................. 26

## OTHER AUTHORITIES

F.R.E. 803(6)......................................................................................................... 5, 6

Fed. R. Civ. P. 23(d) ............................................................................................. 25

Class Counsel respectfully submits this Memorandum of Law in opposition to the Challenges lodged by Defendant City of New York (the "City").

## PRELIMINARY STATEMENT

There are two categories of City Challenges. First, the City claims that certain Class Members are not entitled to compensation because they supposedly were not "Pre-Trial Detainees" as defined in the Stipulation of Settlement (the "Stipulation") when they served some or all their compensable time (the "Pre-Trial Challenges"). As discussed in Point I below, the Pre-Trial Challenges are invalid because the City ignored Class Counsel's repeated requests that it support the Pre-Trial Challenges by producing the underlying "QHIN" reports, because the summary spreadsheets on which the City exclusively relies are not admissible "business records," and because the City's definition of "Pre-Trial Detainee" cannot be reconciled with the plain language of the Stipulation.

Second, the City claims that certain Class Members are not entitled to compensation (wholly or in part) because they signed so-called "general releases" that supposedly extinguished their claims in this case (the "Release Challenges"). The positions the City takes with respect to the Release Challenges are deeply troubling. The City is relying on releases that it obtained in entirely unrelated cases from claimants who had no idea about this class action, much less that by accepting settlements in the underlying cases, they supposedly were waiving their right to compensation in this case. Some of the Class Members at issue were unrepresented in the underlying cases or had been designated by the City as having a Serious Mental Illness, and most of them received much less compensation in the underlying cases than the City now claims they supposedly waived in this case. Moreover, the City is now attempting to use these so-called "general releases" in an entirely unprecedented way: to Class Counsel's knowledge, the City has

never before attempted to prevent a class member from participating in any other class action settlement based on a release executed in a unrelated prior case. And the City's position is entirely arbitrary given that it routinely treats these very releases as limited in nature.

As discussed in Point II below, the Release Challenges must be rejected because enforcing them to bar claims in this clas action would be inconsistent with both New York and federal law. Under New York law, the generic boilerplate contained in the releases at issue cannot be read as sweepingly as the City urges, particularly given the contexts in which the releases were obtained. Applying releases that were executed after this case was filed also would also run afoul of federal law that safeguards the integrity and fairness of class actions. And the Court should deny those Release Challenges that have been lodged against Class Members who were *pro se* in the underlying cases or who had been designated by the City as having a Serious Mental Illness, or which the City did not raise by the deadline required by the Stipulation.

## **ARGUMENT**

## I.    **THE PRE-TRIAL CHALLENGES HAVE NO MERIT**

The Pre-Trial Challenges are invalid for several independent reasons. First, the City failed, despite Class Counsel's repeated requests, to provide DOC's "QHIN" reports, which provide the information that is necessary to assess the validity of the Pre-Trial Challenges. Second, the summary spreadsheets the City provided instead of the QHIN reports are not admissible "business records," and in any event they prove nothing. Finally, the Pre-Trial Challenges rely on a definition of "Pre-Trial Detainee" that cannot be squared with the plain language of the Stipulation.[1]

---

[1] The City's moving papers inconsistently described the number of Pre-Trial Challenges it is asserting. Exhibit B to the Scheiner Declaration includes 33 names not found in either exhibit to the Kepler Declaration. The City has since advised Class Counsel that its Pre-Trial

### A.    The City Failed to Produce the Critical QHIN Reports

The Stipulation required the City to submit each of its Challenges within 60 days of the date that the Administrator received the Class Member's Claim Form and to provide "all documents" supporting each Challenge by that 60-day deadline.  Stipulation ¶¶ 50, 137.  But the City still has not provided "all documents" necessary to support its Pre-Trial Challenges, even though it has been on notice of this failure for more than six months.  Indeed, the City has not provided *any* documents supporting its Pre-Trial Challenges – other than its summary spreadsheets, which as discussed below, are not a valid substitute for producing the underlying documents on which they supposedly are based.

The City first asserted Pre-Trial Challenges on September 5, 2023, but it provided Class Counsel with only a conclusory summary spreadsheet without any supporting documents.  *See* Reinert Decl. Ex. 2.  Two days later, Class Counsel objected to this evidentiary failure:

> Please provide any documents establishing that these claimants were not pre-trial detainees during all or part of the class period.  The file you attached to your email is simply a spreadsheet summarizing the claimants' alleged status.  We cannot respond to the City Challenge with respect to these claimants without the relevant documents.

*Id*. Ex. 3.  One week after that, the City responded that it was "working on that request for supporting documentation."  *Id*. Ex. 4.

Class counsel responded the same day by demanding the production of each challenged Class Member's "QHIN" report – which is DOC's record of each detainee's criminal charges, and, as to each charge, whether the detainee received a sentence, when he or she was sentenced, and the length of any sentence.  *Id*. Ex. 5.  Class Counsel thus promptly notified the City that in

---

Challenges are limited to Class Members listed in Exhibits A and B to the Kepler Declaration. Due to a clerical error, additional Class Members were listed on Exhibit B to the Scheiner Declaration, but the City has withdrawn its Pre-Trial Challenges to those Class Members.

order to support any Pre-Trial Challenges, it had to provide QHIN reports so that Class Counsel

could assess whether a Class Member was a Pre-Trial Detainee during the relevant period.

Defense counsel responded that same day with one sentence:  "Thank you that is helpful."  *Id*.

Ex. 6.  The City neither objected to providing QHIN reports for the challenged Class Members,

nor disputed that QHIN reports were necessary to determine a Class Member's status.

      The City subsequently lodged two more rounds of Pre-Trial Challenges on December 15,

2023 and February 5, 2024.  *Id.* Exs. 7-8.  In response to each, Class Counsel promptly objected

that the City had not provided any QHIN reports.  *See id.* Exs. 9-10.  The City ignored these

objections and did not provide any QHIN reports, *id.* ¶ 8, even though it indisputably has ready

access to them and could have produced them.

      To this day, the City has failed to provide any QHIN reports for any of the Class

Members who are the subject of its Pre-Trial Challenges.  Instead, the City relies exclusively on

the summary spreadsheets appended as Exhibits A and B to the Kepler Declaration, which Mr.

Kepler asserts were compiled from data in DOC's Inmate Information System.  But Mr. Kepler

does not explain the City's failure to provide the underlying QHIN reports, which would enable

Class Counsel and the Court to assess the accuracy of the City's summary spreadsheets.

      The City's refusal to provide the QHIN reports is all the more perplexing because "these

reports can be easily printed."  *Benjamin v. Horn*, No. 75 CIV. 3073 HB, 2008 WL 2462027,

at *14 (S.D.N.Y. June 18, 2008).  Moreover, in *Parker v. City of New York*, 15 Civ. 6733

(E.D.N.Y.) – a prior class action relating to solitary confinement in which the same attorneys

were Class Counsel – the City routinely provided Class Counsel with QHIN reports whenever a

question arose as to whether a particular Class Member was a Pre-Trial Detainee.  Reinert Decl.

¶ 6.  The City's unexplained failure to produce the reports here is fatal to each of its Pre-Trial

4

Challenges.  The City cannot claim surprise at this argument because Class Counsel consistently and repeatedly raised this issue to no avail.  The City has no one to blame but itself for its failure to provide "all documents" supporting its Pre-Trial Challenges by the 60-day deadline.

### B.    The City's Summary Spreadsheets Do Not Satisfy Its Burden

Instead of providing the "easily printed" QHIN reports, *Benjamin*, 2008 WL 2462027, at *14, the City relies exclusively on Exhibits A and B to the Kepler Declaration, which purport to reflect the disposition of various charges faced by Class Members.  The City contends that these summary spreadsheets are "business records" under F.R.E. 803(6) and should be accepted in lieu of the QHIN reports.  This contention fails for several reasons.

First, the Kepler Declaration does not state that the spreadsheets themselves were "made at or near the time by – or from information transmitted by – someone with knowledge"; were "kept in the course of a regularly conducted activity" of DOC; or that creating the spreadsheets "was a regular practice of that activity."  F.R.E. 803(6)(A), (B), (C).  Nor does the Kepler Declaration describe how the spreadsheets were created or identify who created them.  *See Abascal v. Fleckenstein*, 820 F.3d 561, 565–66 (2d Cir. 2016) (rejecting report under F.R.E. 803(6) in part because it was "unclear from the record" who had prepared it); *United States v. Weigand*, No. 20-CR-188 (JSR), 2021 WL 568173, at *3 (S.D.N.Y. Feb. 14, 2021) ("The certification must explain, of course, how the requested information was extracted from the database.").  Indeed, these spreadsheets plainly were created solely for this litigation, not in the regular course of business, which renders them inadmissible.  *See United States v. Feliz*, 467 F.3d 227, 234 (2d Cir. 2006) ("[B]ecause Rule 803(6) requires business records to be kept in the regular course of a business activity, records created in anticipation of litigation do not fall within its definition."); *see also CSI Inv. Partners II, L.P. v. Cendant Corp.*, 507 F. Supp. 2d 384,

420 (S.D.N.Y. 2007), *aff'd*, 328 F. App'x 56 (2d Cir. 2009) ("Because it is not a document produced routinely, the [alleged business record] does not have the reliability indicia required under Rule 803(6), especially in light of the fact that no data to back up the Officer's Certificate has been produced.").

Moreover, the City's repeated refusal to produce the data contained in the QHIN reports upon which the spreadsheets are based weighs against accepting the spreadsheets as admissible business records. *See Potamkin Cadillac Corp. v. B.R.I. Coverage Corp.*, 38 F.3d 627, 632-33 (2d Cir. 1994) (rejection of 803(6) designation was supported by proponent's refusal, despite discovery requests, to present underlying data upon which report allegedly was based). The City failed even to attempt to justify why it should be permitted to use these spreadsheets rather than provide the actual data contained in DOC's electronic records through QHIN reports. *Cf. United States v. Bonomolo*, 566 F. App'x 71, 73–74 (2d Cir. 2014) (affirming admission of records under F.R.E. 803(6) where proponent showed that it used spreadsheets summarizing underlying data in the regular course of business, not just for litigation, and explained how data was propagated into spreadsheet).

This Court should reject the City's effort to deny compensation to Class Members based exclusively on two litigation-generated spreadsheets, after repeatedly refusing to produce the data on which those spreadsheets purportedly are based. Although the City insists that the spreadsheets themselves contain the relevant data and that the burden falls on Class Counsel to prove any errors, this argument merely highlights the problem: the City has denied Class Counsel access to critical records, which makes it impossible for the Court to have any confidence in the City's conclusory assertion that the summary spreadsheets are accurate.

This is no mere formal defect; nor is our concern about accuracy speculative. As discussed below, it is impossible to know whether a Class Member fits the Stipulation's definition of Pre-Trial Detainee without knowing whether he still faced additional open charges after conviction on a different charge. The City's spreadsheets provide conflicting information on that score. For example, while Nasir Cooper was held in DOC custody on one Book and Case Number, he had twelve open criminal cases (Kepler Decl. Ex. A). Only two of those charges resulted in convictions and sentences, yet the City's spreadsheet suggests two different outcomes for the remaining ten charges: Column O suggests that a sentence was imposed, even where those ten charges were dismissed, voided, or otherwise resolved without a conviction, while Column Y suggests that no sentence ever was imposed for those charges. This can be said for almost every other person listed on the Kepler Exhibits – in every case but two, Column O and Column Y suggest different outcomes for charges that did not result in convictions and sentences.

The City easily could have avoided this ambiguity by providing the QHIN reports that Class Counsel repeatedly demanded. The City's exclusive reliance on purported summary spreadsheets is fatal to its Pre-Trial Challenges because those untested, litigation-minted documents are inadmissible. All of the Pre-Trial Challenges therefore should be denied.

### C. The Pre-Trial Challenges Cannot Be Squared with the Definition of "Pre-Trial Detainee" In the Stipulation

All but two of the Pre-Trial Challenges turn on the contention that a person is not a Pre-Trial Detainee once he has been sentenced on any charge, even if he still faces other unresolved charges. But that argument is refuted by the plain language of the Stipulation, which defines a Pre-Trial Detainee as "any person who was confined in the Subject Housing during the Class Period while (i) awaiting trial *and/or* not serving a sentence of incarceration; or (ii) under parole

7

supervision and awaiting a parole revocation hearing."  Stipulation ¶ 17 (emphasis added).  The words "and/or" can mean only one thing:  a Class Member was a Pre-Trial Detainee *either* if he had not yet been sentenced on any charge *or* had been sentenced on one charge but also was "awaiting trial" on another charge.

The City asks this Court to read the word "or" out of the Stipulation, contrary to settled law that the words "and/or" in a contract must be read both conjunctively and disjunctively.  *See*, *e.g.*, *Fairfield Sentry Ltd. (In Liquidation) by & through Krys v. Citibank, N.A. London*, 630 F. Supp. 3d 463, 483-84 (S.D.N.Y. 2022); *Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt. LLC*, 371 F. Supp. 2d 571, 575-76 (S.D.N.Y. 2005).  Although "and" can sometimes be read to mean "and/or," *see*, *e.g. Kaufman v. Microsoft Corp.*, No. 16 CIV. 2880 (AKH), 2020 WL 364136, at *3 (S.D.N.Y. Jan. 22, 2020), the converse simply is not true.

The City contends that rejecting its strained reading of the plain language would render the words "not serving a sentence of incarceration" superfluous.  That is not true either.  A detainee might be sentenced and not face any unresolved charges, or might never have been sentenced and face only unresolved charges.  But some detainees will have been sentenced on one charge while still awaiting trial on a different charge.  That is why Paragraph 17 reads the way it does:  anyone who was either "not serving a sentence of incarceration" at all, or serving a sentence but also "awaiting trial" on other charges is included within the definition.  That is the only thing that the words "and/or" could possibly mean.

Indeed, under the City's reading, the entire phrase "awaiting trial and/or" would be superfluous because once a person was sentenced on any charge, he would not be a Pre-trial Detainee even if he was still "awaiting trial" on different charges.

The City asserts that the unambiguous language in the Stipulation (to which it agreed after extensive negotiations) supposedly is "contrary to the legal theory underpinning the suit" because "different levels of protection apply to discipline of pre-trial detainees and post-conviction prisoners." Def. Br. at 6 (citing *Benjamin v. Fraser*, 264 F.3d 175 (2d Cir. 2001)). It is true that different legal standards apply to detainees and prisoners, but the case law is not clear regarding which standard applies to people who are in the hybrid category of being held while awaiting trial on some charges after being sentenced on others. Even were the case law clear, the parties were free to contract around it, and the only definition of Pre-Trial Detainee that is relevant here is the one found in the Stipulation. The City's observation that different legal standards may apply to detainees and prisoners does not provide any basis for this Court to ignore the plain language of the Stipulation, which is a binding contract between the parties.

For these reasons, a Class Member who had been sentenced and who remained in DOC custody continued to be a Pre-Trial Detainee under the Stipulation if he or she faced other unresolved charges while detained in a Covered Facility. All but two of the challenged Class Members faced additional charges after being sentenced, Reinert Decl. ¶ 12, and those Pre-Trial Challenges therefore should be denied.

> **D.    Certain Pre-Trial Challenges Should Be Rejected Because the Class Members Were Pre-Trial Detainees Even Under the City's Reading**

Leaving aside the dispute regarding the hybrid category of detainees discussed in Point I.C above, at least four Class Members do not meet the City's definition of Pre-Trial Detainee for many eligible days following their purported sentencing dates. The City admits that its Pre-Trial Challenges are directed toward people who had been sentenced on at least one charge "during all or part of the time for which they have made claims." Def. Br. 2. Even under the City's view, therefore, a person is not subject to a valid Pre-Trial Challenge if he had been sentenced on a

charge, then *discharged from custody following that sentence*, and subsequently returned to DOC custody on a different charge. Such persons obviously were being held while awaiting criminal charges when they returned to DOC custody, and they obviously were Pre-Trial Detainees, and not the subjects of valid Pre-Trial Challenges, during their subsequent detentions. At least four Class Members fall into this category. Reinert Decl. ¶ 11. Although Class Counsel asked defense counsel to identify the specific days the City claims are subject to its Pre-Trial Challenges for each Class Member, the City ignored that request and never provided the information. Reinert Decl. ¶ 11. Thus, to the extent the Court finds that there is any validity to the City's Pre-Trial Challenges based on Mr. Kepler's summary spreadsheets, the Court should clarify that those Pre-Trial Challenges do not apply to time served by Class Members upon recommitment to DOC custody on different charges following a sentence.

  **E.**  **One Pre-Trial Challenge Is Untimely**

  As explained in detail in Section II.F below, *see infra* at 37-38, the Stipulation expressly and unambiguously required the City to lodge any City Challenges within 60 days of the date the Administrator received the Claim Form at issue. The City's Pre-Trial Challenge regarding one Class Member was submitted more than 60 days after the Administrator received his Claim Form, rendering it untimely. Reinert Decl. ¶ 10.

**II.**  **THE RELEASE CHALLENGES HAVE NO MERIT**

  The City contends that 57 Class Members should be barred from receiving some or all of their compensation because those individuals entered into releases with the City in entirely unrelated matters. The City's effort to avoid paying these claims is baseless for numerous reasons. First, governing New York contract law and federal constitutional principles foreclose the use of these releases in this manner. Second, many of the releases were executed after this

action was filed and even after the City agreed to settle – facts that the Class Members did not know and that the City did not disclose when it induced the Class Members to sign the releases. The City's attempt to leverage that informational asymmetry is foreclosed by state and federal law. Additionally, this Court should not countenance the City's attempt to bar compensation for Class Members whom the City itself had designated as having a Serious Mental Illness or who were not represented by counsel in the underlying cases. And three of the Release Challenges must be denied as untimely.

**A.   New York Law Prohibits the Use of Broadly Worded Releases to Bar the Claims in This Action**

**1.    The Boilerplate Language Contained in the Releases Is Insufficient to Bar Participation in This Class Action Settlement**

The City contends that releases signed by Class Members in entirely unrelated matters containing broadly worded boilerplate that the City drafted should bar them from collecting the compensation they are due in this case. But New York law cautions courts to read allegedly "general" releases in the litigation context in which they arose, giving them a limited reading when necessary to achieve equitable results.[2]

The City cites *Mangini v. McClurg*, 24 N.Y.2d 556, 562 (1969), to support its contention that boilerplate releases should be read broadly, Def. Br. at 9-10, but *Mangini* in fact supports Plaintiffs' position. As the Court of Appeals explained, putative general releases do not

---

[2]  New York state law controls here. Almost every release on which the City relies was obtained in a state court action or proceeding and concerned matters that took place entirely in New York, making New York law directly controlling. *See Auten v. Auten*, 308 N.Y. 155, 161-62 (1954). With respect to the few releases that were executed as part of a federal settlement, New York law has been incorporated into the federal common law by the Second Circuit. *See Olin Corp. v. Consol. Aluminum Corp.*, 5 F.3d 10, 15 (2d Cir. 1993) (finding that it is "settled" in the Second Circuit that, even if federal common law governs the effect of releases on federal causes of action, federal courts in New York will look to New York law to determine the content of federal contract law).

automatically bar recovery in entirely unrelated cases because of the "realistic recognition that releases contain standardized, even ritualistic, language and are given in circumstances where the parties are sometimes looking no further than the precise matter in dispute that is being settled," such that "the cases are many in which the release has been avoided with respect to uncontemplated transactions despite the generality of the language in the release form." *Id.*

*Mangini* and its progeny – including many federal courts that have applied this New York law – establish that the releases at issue here should be limited to their context. Broad language in a release does not automatically apply to bar claims in subsequent unrelated actions. "In order to be entitled to dismissal of an action based upon a release, the movant must show that the release was intended to cover the subject action or claim . . . . The meaning and coverage of a general release depends upon the purpose for which the release was actually given, and a general release may not be read to cover matters which the parties did not desire or intend to dispose of." *Mazzurco v. PII Sam, LLC*, 153 A.D.3d 1341, 1342 (2d Dep't 2017) (citations and internal quotation marks omitted). "[U]nless it is shown that a specified matter was in dispute at the time a purported release was given, it cannot be held to bar the releasor's rights as to that matter." *Glassberg v. Lee*, 82 A.D.3d 836, 837 (2d Dep't 2011) (citations omitted).

In other words, "courts in New York have repeatedly found that general language alone does not conclusively demonstrate a general release." *Peralta v. City of New York*, No. 19-CV-7565 (JGK), 2022 WL 17832324, at *4 (S.D.N.Y. Dec. 21, 2022); *Campos v. Aegis Realty Mgmt. Corp.*, No. 19 CIV. 2856 (KPF), 2020 WL 433356, at *9 (S.D.N.Y. Jan. 28, 2020) ("[C]ourts applying New York law have looked beyond the language of a general release and to the context in which it was entered into in determining the scope of that release."); *Vornado Realty Tr. v. Castleton Env't. Contractors, LLC*, No. 08 Civ. 4823 (DLI), 2011 WL 4592800, at

*4 (E.D.N.Y. Sept. 30, 2011) ("It is well recognized in New York that where 'form' releases are used, the 'standardized, even ritualistic, language' of the 'form' will give way to the parties' actual intent, thus, subordinating the boilerplate terms of the standardized contract." (quoting *Interpool Ltd. v. Patterson*, No. 89 Civ. 8501 (SWK), 1993 WL 410465, at *11 (S.D.N.Y. Oct. 8, 1993)).

The City cites a handful of cases to support its contention that this Court's inquiry should begin and end with the broad language contained in some of the releases at issue here.  Def. Br. 8-12.  But these cases are inapposite for a variety of reasons.  First, most of them involved *pro se* litigants, and the opinions do not suggest that the plaintiffs made any arguments regarding the impact of New York law on the interpretation of the releases.  *See, e.g.*, *Valdiviezo v. Greer*, 787 F. App'x 48, 49 (2d Cir. 2019); *Johnson v. City of New York*, No. 21 Civ. 10535, 2023 WL 5629232 (S.D.N.Y. Aug. 31, 2023); *Syville v. City of New York*, No. 19 Civ. 9988, 2023 U.S. Dist. LEXIS 232434 (S.D.N.Y. Dec. 20, 2023); *Staples v. Acolatza*, No. 14 Civ. 3922, 2016 WL 4533560 (S.D.N.Y. Mar. 9, 2016).  Indeed, in at least one of the cases, the *pro se* plaintiff did not even file a response to the City's moving papers seeking to enforce the release.  *See Bolling v. City of New York*, No. 18 Civ. 5406, 2021 WL 961758, at *6 (S.D.N.Y. Mar. 15, 2021).  Second, even in those cases that involved represented litigants, the parties did not engage in any meaningful way with the controlling New York law cited by Class Counsel herein.  *See Mateo v. Carinha*, 799 F. App'x 51 (2d Cir. 2020); *Alicea v. City of New York*, No. 1:16-CV-07347 (JLR), 2023 WL 3724131 (S.D.N.Y. May 30, 2023).  In at least one of the counseled cases, the plaintiff filed no opposition to the defendant's motion.  *Singleton v. City of New York*, No. 21 Civ, 489, 2023 WL 6066250 (S.D.N.Y. Sept. 18, 2023).  Although one counseled case provides a cursory discussion of New York law, it does not discuss *Mangini* or its progeny.  *Lloyd v. City of New*

*York*, No. 15 Civ. 8539, 2017 WL 2266876, at \*3 (S.D.N.Y. May 22, 2017).  In short, none of these cases addressed the arguments Plaintiffs raise here.

> **2.    The Context in Which the Releases Were Negotiated Militates Strongly Against Applying Them to Bar Claims in This Class Action**

Judge Castel has succinctly summarized the governing law:  "'[A] release like any contract must be construed to give force and effect to the intention of the parties.'"  *Maddaloni Jewelers, Inc. v. Rolex Watch U.S.A., Inc.*, 354 F. Supp. 2d 293, 299 (S.D.N.Y. 2004) (Castel, J.) (quoting *Pinto v. Allstate Ins. Co.*, 221 F.3d 394, 404 (2d Cir. 2000)).  "'The instrument of release must be strictly construed.'"  *Id*. (quoting *Johnson v. Thruway Speedways, Inc.*, 63 A.D.2d 204, 205 (3d Dep't 1978)).  "A release that employs general terms will not bar claims outside the parties' contemplation at the time the release was executed."  *Id*. (citing *Estes v. New York State Saddle Horse Ass'n Inc.*, 188 A.D.2d 857, 859 (3d Dep't 1992)).

Because the broad boilerplate language contained in many of these releases does not automatically bar the disputed claims, this Court must look to the litigation context in which the releases were executed.  *See Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 655 B.R. 149, 177-78 (Bankr. S.D.N.Y. 2023) ("Mere use of general language is not sufficient to evidence a release of unrelated claims.").  New York law has long provided that "a release may not be read to cover matters which the parties did not desire or intend to dispose of."  *Cahill v. Regan*, 5 N.Y.2d 292, 299 (1959).  Thus, even where a release employs broad language seemingly encompassing a claim, courts will "limit[ ] [it] to those claims within the contemplation of the parties at the time" as evidenced from the purpose for which the release was given and the context in which it was signed.  *In re Actrade Fin. Techs., Ltd.*, 424 B.R. 59, 69-71 (Bankr. S.D.N.Y. 2009) (surveying New York law).  Here, as evidenced by the language of the releases themselves, and by the accompanying declarations from the attorneys who negotiated these

14

releases, the City cannot show that the releases should have the broad application the City now maintains.

In *Cahill*, the question was whether a general release executed in a replevin action barred a later patent action. The New York Court of Appeals held that the general release would not apply in the subsequent action for several reasons that resonate here. First, "[w]hen the releases were executed . . . the parties were solely concerned with settling the controversy then being litigated." 5 N.Y. 2d at 299. Second, the patent action had "no relation" to the prior action. *Id.* Third, the plaintiff was unaware of the potential existence of the patent at the time it executed the prior release, although the defendant was aware of it but failed to disclose this information to the plaintiff. *Id.* Under those circumstances – on all fours with the facts here – the Court of Appeals held that New York law requires interpreting the release as "cover[ing] and barr[ing] only those matters about which there had been some dispute." *Id.*

Courts in this District routinely apply this settled New York law to the same effect. In *Gardstein v. Kemp & Beatley, Inc.*, No. 82 CIV. 0781 (MEL), 1987 WL 7378, at *1-2 (S.D.N.Y. Feb. 20, 1987), the plaintiff had released the defendant in a prior shareholders' action "from all actions, causes of action, suits, . . . controversies, . . . damages, judgments, . . . and demands whatsoever, in law, admiralty or equity, which against the RELEASEE, the RELEASOR, . . . every [sic] had, now have or hereafter can, shall or may, have for, upon, or by reason of any matter, cause or thing whatsoever from the beginning of the world to the day of the date of this RELEASE." *Id.* The defendant argued that this broad language included the ADEA claim that the plaintiff brought in a subsequent action, but the plaintiff maintained that he did not intend for the release to cover his ADEA claim. The Court ruled for the plaintiff, applying *Mangini* and other New York cases to hold that the language of the release did not unambiguously establish its

15

meaning, and that the "circumstances surrounding its execution" were relevant to whether the parties intended the broad language to release the employment-related ADEA claim. *Id.*

These rules have special resonance in personal injury claims such as those that gave rise to most of the releases on which the City relies. *Dury v. Dunadee*, 52 A.D.2d 206, 208-09 (4th Dep't 1976) (referring to "highly specialized rules of interpretation" for releases arising out of personal injury claims). In *Dury*, the release's broad language "would seem on its face to include" the claim for contribution brought in the subsequent action, *id.*, but the court nonetheless held that the release was ambiguous and could not be read to encompass claims that had not been bargained for or discussed in the negotiations leading to the execution of the release. *Id.*; *see also Campos v. Aegis Realty Mgmt. Corp.*, No. 19 CIV. 2856 (KPF), 2020 WL 433356, at *9 (S.D.N.Y. Jan. 28, 2020) (refusing to apply release to bar claims where there was no indication that they were contemplated by the parties, even where text of release "standing alone" encompasses unknown claims); *Actrade Fin. Tech.*, 424 B.R. at 72 ("It is . . . a firm principle of New York law that it is less likely that claims are covered by a general release if they are unknown at the time of the release.").

All of the releases at issue here themselves make clear that the context in which they were negotiated was limited to the specific claims at issue in the prior actions. Every single release that the City has provided begins by reciting the docket number of the case being settled, the PI number for the claim at issue, or the county index number relating to the claims. Reinert Decl. ¶ 16. Courts have held that where such a specific citation to the case being settled is followed even by sweeping boilerplate language, the specific citation cuts against reading the release as a broad general release. *See, e.g., Augustin v. The City of New York*, No. 15290/2014, 2022 WL 1081235, at *2 (Sup. Ct., Kings Cty. Mar. 31, 2022) ("Here, although the release

language is broad, the inclusion of only the *Augustin I* case caption and index number can be read as a limiting factor upon which the release language applied.").  Courts recognize, in other words, that "[i]f the recitals in the release appear to limit the release to only certain claims, demands, or obligations, the release will operate only as to those matters."  *Mazzurco v. PII Sam, LLC*, 153 A.D.3d 1341, 1342, 63 N.Y.S.3d 59, 60 (App Div. 2d Dep't 2017) (citations omitted). Every Release Challenge squarely presents this issue, because the first sentence of every release at issue explicitly refers to a court or Comptroller case number identifying a specific, filed claim. On this ground alone, the Court should construe these releases as limited to the specific claims that the releases referenced and resolved.

This reading is confirmed by the accompanying declarations from the attorneys who represented Class Members in prior actions (and, where applicable, by the Class Members themselves) attesting to the fact that when the releases were executed, the parties were focused on negotiating consideration for the specific claims that were then at issue, not other claims, much less unknown claims.  This evidence demonstrates that "[w]hen the releases were executed . . . the parties were solely concerned with settling the controversy then being litigated." *Cahill*, 5 N.Y. 2d at 299; *see also Dury*, 52 A.D.2d at 208-09.

The parties' knowledge about the plaintiff's claims and injuries at the time the plaintiff enters into a broadly worded release is also relevant to the litigation context.  Under New York law, "a release covering both known and unknown injuries [must] be fairly and knowingly made."  *Haynes v. Garez*, 304 A.D.2d 714, 715-16 (2d Dep't 2003) (citations and internal quotation marks omitted).  It would be inequitable to enforce a general release where the releasor

"has had little time for investigation or deliberation, or because of the existence of overreaching or unfair circumstances." *Id.* (internal quotation marks omitted).[3]

*Chiappone v. North Shore University Hospital*, 164 A.D.3d 463, 464-65 (2d Dep't 2018), is instructive. There, the plaintiff had two separate actions against the defendant. The first arose from an October 2009 procedure in which the plaintiff's husband suffered a perforated duodenum, allegedly as a result of malpractice. The plaintiff and her husband brought a medical malpractice action in July 2010 seeking damages for those injuries. While that action was pending, but before it settled, the plaintiff's husband was admitted again to the defendant's care, during which he fell and fractured his right pelvis, which allegedly led to complications that caused his death. Before the plaintiff filed an action seeking compensation for injuries from the second incident, the first action settled pursuant to a general release with broad language, similar to the boilerplate on which the City relies here. After the plaintiff filed suit for damages from the second incident, the defendant moved to dismiss, relying on the general release executed in the first action. There was no question that the plaintiff was aware of the incident that gave rise to the second claim for damages, but because the incident was not yet "in dispute" at the time the first release was executed, the Court held that the second claim was not barred. *Id.* ("While the plaintiff may have been aware of the incident giving rise to Action No. 2 when she signed the release, any such awareness is insufficient, itself, to establish that the release was intended to

---

[3] This rule applies with particular force to Devin Burns, Julian Cepeda, Nazeem Francis, Jermaine Gordon, Tyreick Grey, Brandon Hong, J'Von Johnson, Jesus Pizzini, Christopher Ransom, Tyque Shabazz, Davon Washington, and Jamek Wright, each of whom signed a release that did not contain any language even purporting to release unknown claims. *See* Reinert Decl. ¶ 17; *see also Bushkin, Gaims, Gaines, Jonas & Stream v. Garber*, 677 F. Supp. 774, 776 (S.D.N.Y. 1988) (holding that even a broad general release form that "does not not contain the 'known or unknown' language . . . will not bar relief for an injury unknown at the time of the release if the settlement agreement was not 'fairly and knowingly made'").

cover any potential claims which were not the subject of Action No. 1."). The Court's holding in *Chiappone* precludes enforcement of the general releases here.

Especially where there is a combination of indicia of unfairness, as there is here, New York courts will not hesitate to limit the application of broadly worded releases. *See Huang v. Llerena-Salazar*, 222 A.D.3d 1033, 1034 (2d Dep't 2023) (circumstances indicating unfairness include language barriers, a lack of explanation of the "legal effect of the release," lack of representation by an attorney, and the existence of unknown injuries sustained in the accident); *Paulino v. Braun*, 170 A.D.3d 506, 506 (1st Dep't 2019) (small consideration, nature of the relationship between the parties, as well as timing and circumstances of release's execution, are viable bases to challenge release executed by unrepresented plaintiff in personal injury action); *Decosta v. Williams*, 119 Misc. 2d 314, 318-20 (Sup. Ct., Kings Cty. 1983) ("The injury to the jaw for which plaintiff . . . brought this present action was clearly unknown and not within the contemplation of the parties when the settlement, in the relatively small amount of $775.75, was made and the release was executed and delivered.").

The City's own course of dealing in prior cases also demonstrates that it never truly intended these releases to bar compensation for entirely unrelated (much less unknown) claims. The City has settled many other claims involving these same Class Members without asserting that a release executed in connection with a prior claim barred the subsequent claim by that Class Member, even if the broad release language would, read alone, bar the subsequent claim.[4]

---

[4] For example, Angel Castro signed a release on August 6, 2020 with no carveout for other cases, but the City settled a different case with him, 2020PI014865, on December 22, 2020. Lamor Evans signed a release on August 27, 2019, with no carveout for other cases, but the City settled a different case with him, PI2018031490, on October 1, 2019. Erinerso Rosario signed a release on February 28, 2019, with no carveout for other cases, but the City settled a different case with him, 2019PI011287, on September 13, 2019. Tyque Shabazz signed a release on March 12, 2021, with no carveout for other cases, but the City settled a different case with him,

Indeed, the record shows that the City's practice was to allow settling parties to carve out of releases any claims they were capable of identifying, without reducing the agreed-upon settlement payment.  To take one example, Jonathan Ogando's March 30, 2023, release references and carves out two other known claims, listing them in blank spaces provided in the City's form.  The City cannot credibly deny that if Mr. Ogando had four known open claims instead of two, it would have allowed him to carve out all four claims without reducing the agreed-upon settlement amount.  In fact, in relying on the March 30, 2023 version of Mr. Oganda's release, the City fails to acknowledge that *it subsequently agreed to allow Mr. Ogando to amend that release on December 11, 2023, specifically to exclude his claim in this case*, without seeking a refund of any of the funds it paid to settle the prior case.  Reinert Decl. ¶ 19 & Ex. 14.  The fact that the City routinely allows any settling party to carve out any open claim he or she can identify without reducing the settlement consideration, and that it willingly consented to amend one of the releases at issue here to carve out the claim in this case for no additional consideration, is "compelling evidence" that the City has always understood that these releases are to have limited application.  *In re Actrade Fin. Techs., Ltd.*, 424 B.R. 59, 74 (Bankr. S.D.N.Y. 2009).

It also bears emphasis that many of the releases at issue were obtained by settling claims for very small sums compared to the compensation at stake here.  The shocking imbalance between the amounts many Class Members received from an earlier settlement and the amount

---

2022PI005528, on November 17, 2022.  Shamar Smith signed a release on November 10, 2021, but the City settled a different case with him, 2020PI005052, on March 2, 2023.  Taurean Williams signed a release on February 2, 2022, containing carveouts for two pending matters, but the City settled a different case with him, 2020PI021813, on June 16, 2022, even though that claim had not been carved out. Reinert Decl. ¶ 18.  In each one of these examples, the later-settled case concerned facts and injuries that arose prior to the first-settled case and therefore would have been barred had the City actually treated these releases as true "general" releases.

the City seeks to bar them from recovering here is yet another reason to deny the Release Challenges.  For example, Nasir Cooper, who spent years in unlawful restrictive confinement beginning when he was an adolescent, is entitled to $363,150 in compensation in this case, and the City is trying to avoid paying him based on a release he signed in a slip and fall case in which he received a paltry $3,000 settlement.  Cooper Decl. ¶ 6.  David McBride settled his prior case for $8,000, and the City is trying to prevent him from collecting $196,800 in this case.  Franklin Robinson settled his prior case for $7,500, and the City is trying to prevent him from collecting $105,000 in this case.  Christopher Sanchez settled his prior case for $3,499, and the City is trying to prevent him from collecting $98,400 in this case.  The dramatically lower consideration these and other Class Members received in their prior cases sheds further light on the litigation context and strongly supports the conclusion that the prior releases were not intended to extinguish the claims here.  *See Johnson v. Lebanese Am. Univ.*, 84 A.D.3d 427, 431 (1st Dep't 2011) ("While courts do not ordinarily question the amount of consideration supporting an agreement, it is appropriate to consider whether a relatively small amount of consideration paid to a releasor in exchange for signing a release suggests that the scope of the release is narrower than is urged by the releasee."); *see also Best v. Yutaka*, 90 N.Y.2d 833, 834 (1997), *overruled on other grounds by Oakes v. Patel*, 20 N.Y.3d 633 (2013); *see also Haynes v. Garez*, 304 A.D.2d 714, 715-16 (2d Dep't 2003); *Lefrak SBN Assocs. v. Kennedy Galleries, Inc.*, 203 A.D.2d 256, 256-57 (2d Dep't 1994).

For each of these reasons, all of the Release Challenges should be denied.[5]

---

[5]  To be sure, the Stipulation permits the City to challenge claims on the ground that "the person's right to payment is barred by . . .  a general or limited release executed by such person."  But just as the City negotiated for the right to assert these Challenges, Class Counsel negotiated for the right to dispute them, which it is doing now.  Moreover, Class Counsel accepts that a prior release *could* preclude a claim in this case.  The problem for the City is that it is required to

**B.    Applying the Releases to Bar Claims in This Case Would Raise Serious Constitutional Questions**

New York's requirement that the releases be applied narrowly is consistent with federal constitutional principles.  As a general matter, the Supreme Court has limited the power of federal, state, and local governments to extract unrelated concessions when they confer benefits through otherwise legitimate governmental conduct, including through contracting.

In *Agency for International Development v. Alliance for Open Society International, Inc.*, 570 U.S. 205 (2013), for example, the federal government agreed to fund non-governmental organizations to combat the global spread of HIV/AIDS, but only if those organizations agreed to adopt policies opposing prostitution and sex trafficking.  The Court held that imposing these conditions on the contracting organizations was impermissible.  *Id.* at 214-15.  The Court did so even though it recognized that contracting parties could always refuse to enter into a contract if they disagreed with the conditions imposed.  *Id.* at 214.  The Court recognized limitations on the government's power to extract waivers of constitutional rights via its contracting power, holding that in the speech context, Congress could impose conditions that were related to "the activities Congress wants to subsidize" but could not "leverage funding to regulate speech outside the contours of the program itself."  *Id.* at 214-15.

In *Nollan v. California Coastal Commission*, 483 U.S. 825 (1987), the Court held that a state could not condition permission for a building permit on the landowner's agreement to grant the public an easement across their property.  As the Court noted, the state would have been required to pay just compensation under the Takings Clause had it ordered the landowner to

---

show that the Class Members' "right to payment is barred" by the releases they have produced, a burden it cannot meet given the governing law, the language of the releases, and the context in which they were executed.

grant the easement. *Id.* at 831. The government could not avoid the Takings Clause by imposing conditions in the permit process. Again, the Court came to this conclusion notwithstanding its assumption that the state could constitutionally prohibit construction altogether to vindicate the public interest in having access to a public beach. *Id.* at 836. The problem, in short, was the lack of nexus between the government's demand and the permission sought by the landholder.

The Court has not only insisted on some nexus between governmental programs and the exactions they demand, but also has expressed concern when the price imposed for participation is too high, even where a nexus exists. In *Dolan v. City of Tigard*, 512 U.S. 374 (1994), the Court addressed a land use regulation that conditioned a property owner's development of land on the owner's agreement to make adjacent land open to the public for construction of a pedestrian/bicycle pathway. *Id.* at 378-79. Although the Court found a sufficient nexus between the planned development and the concession, it insisted on some "rough proportionality" between the exaction demanded and the impact of the proposed development. *Id.* at 375, 387-88, 394-96. Similarly, although a state is free to fund medical care associated with childbirth but not abortion, it does not follow that a state may withhold all welfare benefits from any person who has exercised a constitutional right. *Cf. Harris v. McRae*, 448 U. S. 297, 317, n.19 (1980).

These principles squarely apply here. For the City to condition settlement of a lawsuit on the plaintiff's blanket waiver of the right to pursue unrelated claims – whether known or unknown – that the City had violated his constitutional rights, there must be, at the very least, some proportional nexus between the claims being waived and the claim being compromised. It is not enough simply to observe that the Class Members in this case were not required to enter into a release and that they could have litigated, rather than settled, their prior claims thereby preserving their unknown constitutional claims for future litigation. Nor is it enough to show

that the Class Members were not subjected to the kind of coercion that might suffice to void a contract between private parties, or that compelling the Class Member to waive all claims, known and unknown, served some broader legitimate public purpose.  As the Court observed in *Nollan*, there must be a nexus between the action in which the City is engaged (here the settlement of specific identifiable claims) and its demand that plaintiffs broadly waive all of their other constitutional rights, especially when the waiver purportedly includes both known and unknown claims.  This is especially true for constitutional claims that question the validity of government action itself.  As the Court emphasized in *Legal Services Corp. v. Velazquez*, 531 U.S. 533, 548 (2001), "[w]e must be vigilant when [the government] imposes rules and conditions which in effect insulate its own laws from legitimate judicial challenge."

Based on this analysis, the general releases on which the City relies to maintain the Release Challenges can be read only as limited releases as they pertain to constitutional claims, and they can support a Release Challenge only if the specific claims released therein have a nexus to the constitutional claims asserted here.  As discussed above, this narrow construction is required both by federal constitutional principles and New York law.  Accordingly,  the Court should reject all of the Release Challenges.

**C.    The City's Releases Executed After This Action Was Filed are Prohibited by F.R.C.P. 23(d) and New York Law**

Many of the releases at issue were executed after this action was filed.  Indeed, many were executed after the City already had agreed to settle and knew specifically how much each Class Member was entitled to receive under the settlement.  Because the City maintained that the Class List was confidential and could not be disclosed to Class Counsel until shortly before the class was certified, only the City had access to this information.  ECF 75.  The City induced Class Members to execute the releases that it now claims vitiated Class Members' rights to

24

compensation here without informing Class Counsel that it was doing so and without informing the Class Members that they supposedly were waiving their claims in this case. This violated Fed. R. Civ. P. 23(d) and New York law.

We begin with F.R.C.P. 23(d), which "provides courts with considerable discretion in regulating defendant communications with putative class members to prevent abuse." *Kater v. Churchill Downs, Inc.*, 423 F. Supp.3d 1055, 1062 (W.D. Wash. 2019) (citations omitted). Given the opportunities for over-reaching when communications with putative class members are unrestricted, and the management challenges posed by representative litigation, this Court has "both the duty and the broad authority to exercise control over a class action and to enter appropriate orders governing the conduct of counsel and parties." *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 100 (1981); *id.* at 104 n.20 (contemplating remedial measures under Rule 23(d) when communications or conduct threaten the fair administration of class actions); *Balasanyan v. Nordstrom, Inc.*, No 10-cv-2671JM-WMC, 2012 WL 760566, at *3 (S.D. Cal. Mar. 8, 2012) (finding that the court's supervisory powers under Rule 23(d) extend to any communications affecting participation in the lawsuit); *In re Currency Conversion Fee Antitrust Litig.*, 361 F. Supp. 2d 237, 252 (S.D.N.Y. 2005) ("Communications that threaten the choice of remedies available to class members are subject to a district court's supervision.").

"This supervisory authority exists even before a class is certified." *Brown v. Mustang Sally's Spirits & Grill, Inc.*, No. 12-CV-529, 2012 WL 4764585, at *2 (W.D.N.Y. Oct. 5, 2012); *accord, e.g., Cheverez v. Plains all Am. Pipeline, LP*, No. 15-CV-4113, 2016 WL 861107, at *2 (C.D. Cal. Mar. 3, 2016); Fed. Jud. Ctr., Manual for Complex Litig. § 21.12 (4th ed. 2004) ("Rule 23(d) authorizes the court to regulate communications with potential class members, even before certification."). Courts must act vigilantly "to ensure that potential class members receive

accurate and impartial information regarding the status, purposes and effects of the class action."
*Hinds Cnty. v. Wachovia Bank N.A.*, 790 F. Supp. 2d 125, 134 (S.D.N.Y. 2011).

More specifically, Rule 23(d) grants federal courts the authority to impose consequences
when a defendant has coercive or misleading communications with class members.  A
defendant's duty to prevent misleading or coercive communications arises "as of the filing date
of the complaint."  *In re Currency Conversion Fee Antitrust Litig.*, 361 F. Supp. 2d at 251-52.
The general releases relied upon by the City were obtained under circumstances that were both
coercive and misleading.

Communications with putative class members are "inherently coercive" when there is an
ongoing and unequal relationship between the defendant and the putative class members.  *See*
*Zamboni v. Pepe W. 48th St. LLC*, No. 12 CIV. 3157 (AJN)(JCF), 2013 WL 978935, at \*3
(S.D.N.Y. Mar. 12, 2013) (using consumer or employment relationships as examples where
communications may be inherently coercive); *see also Li v. A Perfect Day Franchise, Inc.*, 270
F.R.D. 509, 515 (N.D. Cal. 2010) (finding workers with limited education and poor language
skills vulnerable); *O'Connor v. Uber Techs. Inc.*, No. C-13-3826 EMC, 2013 WL 6407583, at \*6
(N.D. Cal. Dec. 6, 2013) (finding Uber drivers, many without English as a native language,
vulnerable; *Piekarski v. Amedisys Ill., LLC*, 4 F. Supp. 3d 952, 956 (N.D. Ill. 2013) (finding
home healthcare workers vulnerable); *Williams v. Securitas Sec. Servs. USA, Inc.*, No. 10-7181,
2011 WL 2713741, at \*3 (E.D. Pa. July 13, 2011) (finding hourly paid security guards
vulnerable); *Sorrentino v. ASN Roosevelt Ctr. LLC*, 584 F. Supp. 2d 529, 533 (E.D.N.Y. 2008)
(finding a prior landlord-tenant relationship to be potentially coercive).  Even where class
members are sophisticated entities with in-house counsel, courts have used their authority under
Rule 23(d) to manage communications about settlement between defense counsel and class

26

members.  *See, e.g.*, *Dial Corp. v. News Corp.*, No. 13CV6802, 2015 WL 9256930, at *2 (S.D.N.Y. Nov. 16, 2015).  The relationship between incarcerated people and their jailers plainly is inherently more coercive than that between consumers and businesses or employees and employers.

Even if the releases obtained by the City were not inherently coercive, this Court still retains authority under Rule 23(d) to remedy misleading communications between the City and putative class members.  *See In re Currency Conversion Fee Antitrust Litig.*, 361 F. Supp. 2d at 251-52.  It was misleading for the City to obtain general releases from putative class members without informing them that this class action had been filed.  *See Cornet v. Twitter, Inc.*, No. 3:22-CV-06857 (JD), 2022 WL 18396334, at *1-2 (N.D. Cal. Dec. 14, 2022) ("communications should not be rendered misleading by omitting material information about a pending lawsuit."). Similarly, in *Sorrentino v. ASN Roosevelt Center. LLC*, 584 F. Supp. 2d 529, 534-35 (E.D.N.Y. 2008), the Court ordered that the defendant could not communicate settlement offers to putative class members, pre-certification, without also including a communication from plaintiffs' counsel providing information about the putative class action.

Of particular relevance here, courts may refuse to enforce releases or other agreements that would undermine administration of a class action if those agreements were obtained by defendants without notifying putative class members about the pending class action.  "In cases like this—where defendants have successfully solicited putative class members to enter agreements during litigation that might frustrate the ability to participate in class litigation but did not notify the class members that they might forfeit class litigation rights—courts have refused to enforce the contract provisions that would exclude the putative class members from

the class." *See Portillo v. Nat'l Freight, Inc.*, No. 15-CV-7908-JHR-KMW, 2021 WL 3486894, at *6 (D.N.J. Aug. 9, 2021) (collecting cases).

The rule applies as soon as the class action complaint is filed. Thus, courts routinely refuse to enforce releases obtained by a defendant from putative class members without informing them of a pending but uncertified class action. *See Torres Romero v. May Trucking Co.*, No. EDCV 17-2406 JGB, 2018 WL 5905604, at *3 (C.D. Cal. Feb. 21, 2018) (releases omitted contact information for Plaintiff's counsel and information about the claims being released); *Marino v. CACafe, Inc.*, No. 16-CV-6291 YGR, 2017 WL 1540717, at *2-3 (N.D. Cal. Apr. 28, 2017) (no information given about pending class action); *Cheverez v. Plains all Am. Pipeline, LP*, No. CV15-4113 PSG (JEMx), 2016 WL 861107, at *4 (C.D. Cal. Mar. 3, 2016) (releases "altogether failed to mention any pending class action"); *O'Connor v. Uber Techs., Inc.*, No. C-13-3826 EMC, 2014 WL 1760314, at *7 (N.D. Cal. May 2, 2014) ("[P]rocuring waiver, settlement, or arbitration agreements without providing adequate information about the pending class action [constitutes] misleading communications which the court may limit.") (collecting cases); *Burford v. Cargil Inc.*, No. 05-0283, 2007 WL 81667, at *2 (W.D. La. 2007) ("[U]se of [a] general receipt and release . . . by the Defendant in regards to putative class members, without notification of the pending putative class action, is misleading as a matter of law."); 2 McLaughlin on Class Actions § 11:1 and n.34 (14th ed.) ("[I]f a defendant attempts to obtain a release of claims in a pending class action without informing putative class members of the pendency of the lawsuit, it is likely that the releases obtained would be voidable.").[6]

---

[6] New York law recognizes a similar principle. In *Carnegie v. H&R Block, Inc.*, 180 Misc. 2d 67, 72 (N.Y. Sup. Ct., N.Y. Cty. 1999), for example, after the class action was filed but before the class was certified, the defendant presented customers with an arbitration clause in the ordinary course of business in which customers waived participation in class actions. Because

Many of these cases address facts similar to those presented here.  In *Marino*, the Court refused to enforce general releases obtained by the defendant after a class action complaint was filed but before it was certified because the defendant "did not inform putative class members that there was a lawsuit pending that concerned their legal rights, the nature of the claims, plaintiff's counsel's contact information, the status of the case, or any other information that might have permitted them to allow them to make an informed decision about the waiver of their rights."  2017 WL 1540717, at *2-3.

Similarly, in *Reed v. Scientific Games Corp.*, 18 Civ. 0565, 2021 WL 2473930 (W.D. Wash. June 17, 2021), the Court refused to enforce changes made by the defendant to its terms and conditions of use, "which, if accepted, would essentially opt putative class members out of the class" when those conditions were imposed "without any acknowledgment of this litigation, description of the claims asserted, summary of the status of the case, input from the named plaintiff or her counsel, or oversight from the Court."  *Id.* at *4.  Finding that it had authority to invalidate the contract even though the class had not yet been certified at the time the changes to the terms and conditions of use were agreed to by putative class members, the Court ruled that the defendant's communication to class members was misleading because "it failed to notify putative class members that they were at risk of forfeiting claims that had already accrued and were being actively litigated on their behalf."  *Id.* at *4-*5.

And in *Rogers v. WEBstaurant Store, Inc.*, No. 4:18-CV-00074 (JHM), 2018 WL 3058882, at *5-7 (W.D. Ky. June 20, 2018), the Court found that waivers and releases obtained by the defendant in a class and collective action were misleading because the employees had

---

the defendant did not notify customers about the putative class action, the Court declined to enforce the arbitration clause for class members who declined to opt out of the action.

executed the document "without full knowledge of the facts." *Id.*; *see also Gonzalez v. Preferred Freezer Servs. LBF, LLC*, No. CV 12 -03467, 2012 WL 4466605, at *1 (C.D. Cal. 2012). The Court ordered the defendant to notify class members who had executed the waiver and release that they would be allowed to join the collective action notwithstanding the waiver and release or acceptance of the compensation offered in the waiver and release. *Rogers*, 2018 WL 3058882, at *6.

Courts also have refused to enforce arbitration agreements between a defendant and putative class members for similar reasons and in factual scenarios analogous to this case. *See*, *e.g.*, *Chen-Oster v. Goldman, Sachs & Co.*, 449 F. Supp. 3d 216, 271–72 (S.D.N.Y. 2020), *objections overruled*, No. 10-CV-6950 (ATR)(WL), 2021 WL 4199912 (S.D.N.Y. Sept. 15, 2021) (where defendant obtained arbitration agreements from putative class members prior to certification, holding that class members could opt out of arbitration agreement and participate in the class action); *O'Conner v. Agilant Sols., Inc.*, 444 F. Supp. 3d 593, 603-04 (S.D.N.Y. 2020) (invalidating arbitration agreements obtained from putative members of a FLSA collective action because the agreement did not communicate any information to those employees about the pending putative collective action); *In re Currency Conversion Fee Antitrust Litigation*, 361 F. Supp. 2d 237, 250-54 (S.D.N.Y. 2005) (striking arbitration agreements obtained after class action complaint filed but before certification based on Rule 23(d) and on the grounds that they were unconscionable, because defendant did not disclose existence of pending class action to putative class members); 2 McLaughlin on Class Actions § 11:1 (19th ed.) ("Courts have also used their authority to limit coercive communications to invalidate arbitration agreements rolled out after the filing of a lawsuit if the agreement might interfere with members' rights, reasoning that the purported agreement constituted an improper communication with putative class

members.").  In *In re Currency Conversion Fee Antitrust Litig.*, the Court specifically rejected

the Defendant's argument that it was not required "to describe existing lawsuits that may, but not

necessarily will, be affected by the [arbitration] provision at some unspecified time in the

future."  361 F. Supp. 2d at 251.

Defendants are free to settle with a putative class member, but only after the defendant

has advised him or her that the class action is pending, how it may affect his or her rights, and

how to contact putative class counsel.  Once such disclosure is made, such settlement

communications are neither coercive nor misleading and the resulting release is enforceable.  *See*

*Eshelman v. OrthoClear Holdings, Inc.*, No. 07-CV-01429 (JSW), 2007 WL 2572349, at *3

(N.D. Cal. Sept. 4, 2007).[7]  But that is not what happened here.

It is undisputed that the City obtained these releases without telling Class Members

anything about this pending putative class action.  Class Counsel have submitted herewith

declarations from both Class Members and their attorneys in the prior cases making clear that the

City never provided them with any information about the pendency of this case.  When these

underlying cases settled, the City already had generated the Class List and therefore specifically

knew how much compensation each claimant was entitled to receive in this case, but did not

disclose to Class Members the fact of their claims and how much compensation they would be

giving up by unwittingly signing the releases to settle their other entirely unrelated cases.  Nor

did the City provide the Class Members with Class Counsel's contact information or disclose to

Class Counsel that the City was communicating with and attempting to obtain releases from

Class Members.  *See Gortat v. Capala Bros.*, No. 07-CV-3629 (ILG)(SMG), 2010 WL 1879922,

---

[7]  Even then, however, courts have held that the class member who executed such a
release must have the opportunity to withdraw it.  *See, e.g.*, *Stafford v. Brink's, Inc.*, No. 14-CV-
1352 (MWF)(PLA), 2015 WL 12912324, at *3-4 (C.D. Cal. Aug. 14, 2015).

at *2 (E.D.N.Y. May 10, 2010), *objections overruled*, 2010 WL 3417847 (E.D.N.Y. Aug. 27, 2010) (collecting cases regarding violations and appropriate sanctions for such communications).

The Court need not make any findings about the City's intent to invalidate these releases because the focus under Rule 23(d) is limited to whether the putative Class Members had sufficient information to ensure the fairness of the class action process. *Portillo v. Nat'l Freight, Inc.*, No. 15-CV-7908 (JHR)(KMW), 2021 WL 3486894, at *5 (D.N.J. Aug. 9, 2021) (finding that communication was "misleading and coercive and threatened the fairness of this litigation, even if this was not [defendant's] intention"); *Jubinville v. Hill's Pet Nutrition, Inc.*, No. 19-74WES, 2019 WL 1584679, at *8 (D.R.I. Apr. 12, 2019) (holding that "intent is not conclusive" and court must consider the "totality of the effect of the communications"); *O'Connor,* 2013 WL 6407583, at *5 ("Wilful misconduct on the defendant's part is not required so long as the effect is to interfere with class members' rights."); *Jones v. Jeld-Wen, Inc.*, 250 F.R.D. 554, 562 (S.D. Fla. 2008) ("[A]lthough the Court does not find that Jeld-Wen intended to interfere with the class action through its communication or for its conduct to be abusive, the Court, nonetheless, recognizes that, as a practical matter, the communication may, in fact, have the effect of interfering with the integrity of the class action.").

It is of no moment whether the communication between the City and putative class member directly implicated the *Miller* litigation or merely involved an alleged general release that the City contends extinguished class claims in *Miller* along with other claims. A communication is deceptive and misleading if it "induce[s] putative class members into forfeiting their rights by making them an offer and failing to disclose the existence of litigation." *Balasanyan v. Nordstrom, Inc.*, No. 10-CV-2671 (JM) (WMC), 2012 WL 760566, at *3-4 (S.D. Cal. Mar. 8, 2012) (invalidating arbitration agreements agreed to by putative class members pre-

certification).  The alternative "would create an incentive to engage in misleading behavior."  *Id.* Indeed, even where a defendant plausibly explained that it changed its arbitration agreements in response to a recent Supreme Court decision and that it was unaware of the class action litigation at the time, courts have invalidated such agreements if they were implemented even on the same day that class action litigation commenced.  *Weinstein v. Jenny Craig Operations*, 132 A.D.3d 446, 446-47 (1st Dep't 2015) (finding communication misleading because it did not inform class members of the pendency of the litigation).

The releases are also invalid under New York law, which refuses to enforce a release obtained by a party that has exploited informational asymmetry.  Where one party has superior knowledge of facts that the other party cannot obtain with reasonable efforts, and where that information would be material to the party with the information deficit, New York courts do not enforce the resulting contract.  *Sterling Nat. Bank v. Israel Disc. Bank of New York*, 305 A.D.2d 184, 186 (1st Dep't 2003) ("We note in this connection a tendency in New York to apply the rule of superior knowledge in an array of contexts in which silence would at one time have escaped criticism."); *Callahan v. Callahan*, 127 A.D.2d 298, 300-01 (3rd Dep't 1987) ("Nondisclosure is tantamount to an affirmative misrepresentation where a party to a transaction is duty-bound to disclose certain pertinent information . . . Such duty to disclose may arise where . . . a party has superior knowledge not available to the other."); *see also U.S. Bank Nat'l Ass'n v. BFPRU I, LLC*, 230 F. Supp. 3d 253, 260-61 (S.D.N.Y. 2017); *TVT Records v. Island Def Jam Music Grp.*, 412 F.3d 82, 91 (2d Cir. 2005).  This is so even where the relevant information could be discerned by reviewing public court dockets.  *Mohegan Lake Motors, Inc. v. Maoli*, No. 16-CV-06717 (NSR), 2017 WL 6335905, at *6 & n.7 (S.D.N.Y. Dec. 7, 2017).  Here, the City consistently had superior knowledge compared to putative Class Members:  (1) after the

complaint was filed; (2) after the Defendants accepted the mediator's proposal regarding settlement terms, by which time it had a list of the specific individuals entitled to compensation in this case; and (3) after the City signed the Stipulation. Under New York law, releases obtained after any of these dates may not be enforced here, where Defendant possessed superior knowledge about this action and did not share that knowledge with Class Members.

Critically, the affected Class Members are not attempting to have their cake and eat it too, nor are they seeking to deprive the City of the benefit of its bargain. The City got what it bargained for in the prior cases: the dismissal or resolution of *those* claims and a release from any future claims regarding the underlying incidents. "This is not the case of an attempted rescission of a contract, upon the ground of fraud and the plaintiff is not, therefore, under any obligation to return what he has received, or to tender restoration. He is not seeking to disaffirm the agreement actually made, but merely objecting to the application of the written evidence of it to a subject which the parties did not intend to include in it." *Kirchner v. New Home Sewing Mach. Co.*, 135 N.Y. 182, 190 (1892).

The City warns that the sky is falling – that applying these rules would hold the City to an impossible standard, upending its ability to settle claims. But the City can continue to enter settlements freely. Adhering to the requirements of Rule 23, which by its terms applies only to class actions, will not disturb the City's longstanding legal practices. That is because the City rarely – if ever – invokes boilerplate general releases to bar claims in class actions. We are not aware of any case before this one in which the City has ever attempted to disqualify class members based on boilerplate releases executed in unrelated prior settlements. And if in the future there is a pending class action that the City wishes to resolve in connection with the resolution of an unrelated claim, it need only disclose the pendency of the class action and

include it in the release, which would ensure a meaningful and fair negotiation between parties with symmetrical information. This is not about placing an unfair or untenable burden on the City. It is about preventing the City from taking unfair advantage of its superior information to the detriment of a vulnerable population of claimants with whom it settled completely unrelated claims, often for very small amounts.

Perversely, the City also contends that limiting these releases would "infantilize" Class Members and harm future claimants by foreclosing their ability to contract. Once again, nothing would prevent any future claimant from signing a release with the City in exchange for consideration. The question is merely whether that release would preclude the person from participating in a future class action settlement, involving entirely unrelated claims, where the City never informed the person that he or she was a putative class member and would forfeit potentially valuable rights by signing the release.

As set forth in the accompanying Reinert Declaration, 34 of the Class Members who are subject to Release Challenges executed the releases after this case was filed. Reinert Decl. ¶ 21. Thirteen of them executed the releases after the City agreed to the mediator's proposal containing all of the material terms of the settlement. *Id*. One of them executed the release after the Stipulation was signed. *Id*. None of these individuals or their attorneys was apprised of the pendency of *Miller* or of the City's agreement to settle *Miller* when these releases were executed. *Id*. ¶ 22. All of these Release Challenges should be denied.

### D.    The Court Should Refuse to Enforce Releases Executed by Individuals Who the City Itself Designated as Having a Serious Mental Illness

Fifteen of the releases at issue were executed by individuals whom the City itself had formally designated as having a Serious Mental Illness. Reinert Decl. ¶ 23. Enforcing purported general releases against such seriously mentally ill Class Members would be particularly unfair.

*See Smith v. New York*, No. 12 Civ. 851, 2014 WL 6783194, at *5 (E.D.N.Y. Dec. 2, 2014)

(refusing to enforce general release where "Corporation Counsel knew or should have known of

plaintiff's [mental health] conditions, because the health reports discussed above were in fact

written by New York City's Correctional Health Services.  Even if the Corporation Counsel had

no reason to know of Smith's conditions, Smith might ultimately obtain relief where it would

work no undue prejudice on the defendants and where to hold otherwise would be inequitable.").

The City has provided no evidence that any protective measures were taken to ensure that these

individuals fully understood the nature of the releases they were executing.  As such, this Court

should not enforce these fifteen releases.

### E.   The Court Should Refuse to Enforce Releases Executed by Individuals Who Were Unrepresented

Two of the Class Members who are subject to Release Challenges were unrepresented in

their underlying cases.  Scheiner Decl. Ex. A.  This fact militates strongly against giving a broad

reading to the boilerplate contained in these releases, which the City drafted, and which were not

negotiable or negotiated.  *See Smith*, 2014 WL 6783194, at *6; *Roland v. Rivera,* No. 9:07–CV–

230 (FJS/DEP), 2007 WL 1651840 (N.D.N.Y. June 6, 2007).

Take, for example, the circumstances of Christopher Ransom's release.  As set forth in

his accompanying declaration, he was *pro se* in his underlying case.  An attorney with the Law

Department's Special Federal Litigation Division – the same Division defending this case – took

Mr. Ransom's deposition.  Immediately after questioning him, she offered him $1,000.00 to

settle his case, and without consulting with an attorney, he accepted.  The City's attorney assured

Mr. Ransom that he would not be giving up any other claims against the City, and the City's

attorney through her own research identified two of his open cases and expressly carved them

out of the release, the broad language of which Mr. Ransom foreseeably did not understand.  At

the time, senior City officials including Corporation Counsel and the Comptroller had already

approved $53 million in funding to pay claims in this case, and $164,800.00 had been allocated

to Mr. Ransom's claim. Incredibly, the City is standing by its position that it is now appropriate

to bar Mr. Ransom from receiving that compensation based on a boilerplate release in a

$1,000.00 settlement, which Mr. Ransom signed *pro se* based on misleading information

provided by the City's attorney.

Both of the Release Challenges to Class Members who were *pro se* in the underlying

cases should be rejected.

### F.    The Court Should Reject Untimely Release Challenges

Three of the Release Challenges must be denied because they are untimely.

The Stipulation provides unambiguously that any City Challenge must be lodged within

60 days of the date that the Administrator received the Claim Form at issue. Stipulation ¶ 50

("The 'City Challenge Deadline' shall be the deadline for the City to submit a City Challenge to

any Claim Form, which shall be sixty (60) days from the date such Claim Form is initially

received by the Administrator.").

This is a strict deadline. The parties extensively negotiated about, and the Stipulation

provides for, the possibility of extending deadlines based upon participation levels, and a cure

period for Class Members to submit untimely Claim Forms with good cause. There is no cure

period for the City Challenge Deadline.

We anticipate that the City may argue that there typically is a delay of a few days

between the date the Administrator receives a Claim Form and the date it makes the Claim Form

available to the City and Class Counsel. That is true, but it hardly entitles the City to an

unwritten and unauthorized extension of the agreed-upon 60-day deadline. Notably, the

Administrator is under the City's control.  The Administrator contracted with the City, not Class Counsel; the City is paying all of the Administrator's fees and costs, not Class Counsel; and the City expressly undertook the obligation to "ensure that the Administrator complies with the terms of this Stipulation."  Stipulation ¶¶ 99-101.  The City has asserted baselessly that the City Challenge Deadline should run from when it received "notice" of the Claim Form from the Administrator, but that is not what the Stipulation says, nor would it make any sense to allow the City to extend the agreed-upon deadline based on its failure to communicate with its vendor.

Moreover, as of July 2023 at the latest, the City was on notice of the fact that the Administrator's practice was to provide biweekly updates to the parties, including by providing information about the dates when recently filed Claim Forma were received.  Reinert Decl. ¶ 25.  The City never instructed the Administratory to provide such notice more frequently, even though it easily could have done so.  *Id*.  The City cannot show that it was prejudiced by any modest lag in being notified aboutwhen a Claim Form was received, and even if it could, there would be no basis for this Court to ignore the plain language of the Stipulation and afford the City a cure period that Class Counsel never agreed to.

As set forth in the accompanying Reinert Declaration, three Release Challenges plainly are untimely.  Reinert Decl. ¶ 24.  These untimely Release Challenges must be denied.

## CONCLUSION

For the foregoing reasons, all of the Pre-Trial Challenges and Release Challenges should be denied.

Dated:  April 5, 2024
        New York, New York

Respectfully submitted,

_____
Eric Hecker
John R. Cuti
Alexander Goldenberg
Daniel Mullkoff
Jazly Liriano
CUTI HECKER WANG LLP
305 Broadway, Sixth Floor
New York, NY 10007
(212) 620-2600

Alexander Reinert
55 Fifth Avenue, Room 1005
New York, NY 10003
(646) 592-6543

*Attorneys for Plaintiffs*